# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

USGEN NEW ENGLAND, INC.,    )
    )
       Plaintiff,    )
   vs.    )
    )
MICHAEL O. LEAVITT,    )
in his capacity as Administrator    )    No. 04-12225 (RCL)
of the U.S. Environmental Protection    )
Agency, et al.,    )
    )
       Defendants.    )
_____ )

# APPENDIX A
# TO MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

(Slip Opinion)

NOTICE: This order is subject to formal revision before publication
in the Environmental Administrative Decisions (E.A.D.). Readers
are requested to notify the Environmental Appeals Board, U.S.
Environmental Protection Agency, Washington, D.C. 20460, of any
typographical or other formal errors, in order that corrections may be
made before publication.

## BEFORE THE ENVIRONMENTAL APPEALS BOARD
## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## WASHINGTON, D.C.

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) |
| USGen New England, Inc. | ) |
|   Brayton Point Station | ) NPDES Appeal No. 03-12 |
|  | ) |
| NPDES Permit No. MA-0003654 | ) |
|  | ) |
|  | ) |

[Decided July 23, 2004]

### *ORDER DENYING MOTION FOR EVIDENTIARY HEARING*

*Before Environmental Appeals Judges Scott C. Fulton,
Edward E. Reich, and Kathie A. Stein.*

**USGEN NEW ENGLAND, INC.**

NPDES Appeal No. 03-12

*ORDER DENYING MOTION FOR EVIDENTIARY HEARING*

Decided July 23, 2004

*Before Environmental Appeals Judges Scott C. Fulton,*
*Edward E. Reich, and Kathie A. Stein.*

*Opinion of the Board by Judge Reich:*

This matter is before the Environmental Appeals Board ("Board") on appeal by USGen New England, Inc. ("USGen" or "Petitioner") from a final National Pollutant Discharge Elimination System permit decision issued under the Clean Water Act ("CWA" or "Act"), 33 U.S.C. §§ 1251-1387, by Region I ("Region") of the United States Environmental Protection Agency ("EPA" or "Agency"). The Region issued the permit decision, NPDES Permit No. MA 0003654, on October 6, 2003, for USGen's power plant at Brayton Point Station in Massachusetts.

USGen's appeal challenges several permit conditions, principally those limiting the station's cooling water intakes and thermal discharges under CWA sections 316(a) and (b). At the time it filed its permit appeal, USGen filed several motions. This Order addresses one of these motions, USGen's Motion for Evidentiary Hearing ("Motion"). As explained more fully below, USGen's request for an evidentiary hearing comes approximately three years after EPA amended its procedural regulations for NPDES permit issuance to eliminate the evidentiary hearing requirement. Because we find that USGen's Motion is, in essence, a challenge to the amended regulations, and because we find that USGen fails to overcome the strong presumption against the Board's reviewing challenges to the validity of a regulation, we deny USGen's Motion.

2                    **USGEN NEW ENGLAND, INC.**

## I. *BACKGROUND*

**A.** *Statutory and Regulatory Background*

### 1. *Relevant Clean Water Act Provisions*

The CWA makes it unlawful for any person to discharge any pollutant into the waters of the United States from any point source, except as authorized by specified permitting sections of the Act, one of which is section 402. 33 U.S.C. §§ 1311(a), 1342(a). Section 402 establishes the CWA's principal permitting program, the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342(a); *accord In re City of Moscow*, 10 E.A.D. 135, 137 n.1 (EAB 2001); *In re Town of Ashland Wastewater Treatment Facility*, 9 E.A.D. 661, 662 n.1 (EAB 2001). Under this section of the Act, the EPA may *"after opportunity for public hearing*, issue a permit for the discharge of any pollutant, or combination of pollutants" in accordance with certain conditions.[1] 33 U.S.C. § 1342(a) (emphasis added). NPDES permits generally contain discharge limitations and establish related monitoring and reporting requirements. *Id.* § 1342(a)(1)-(2); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 174 (2000).

The term "pollutant" under the CWA includes "heat." 33 U.S.C. § 1362(6); *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872, 874 (1st Cir. 1978). Section 316(a) of the Act applies to discharges of heat (i.e., thermal discharges) from point sources and allows EPA, for a specific point source discharger, to impose less stringent effluent

---

[1] States that have received authorization from the Agency under section 402(b) administer the NPDES permit program within their boundaries in lieu of the Federal government. 33 U.S.C. § 1342(b), (c). As of today's date, Massachusetts has not received such authorization. *See* http://cfpub2.epa.gov/npdes/statestats.cfm (viewed July 21, 2004); *see also* EPA Region I Response to Petition for Review at 6. Thus, EPA (and, in particular, Region I) continues to issue NPDES permits within the state pursuant to section 402(a). 33 U.S.C. § 1342(a); *In re Avon Custom Mixing Servs., Inc.*, 10 E.A.D. 700, 702 n.4 (EAB 2001).

USGEN NEW ENGLAND, INC.                                    3

limitations on thermal discharges than might otherwise be required under
section 301 (or 306)[2]

> whenever the owner or operator of any such source,
> *after opportunity for public hearing*, can demonstrate
> * * * that any effluent limitation proposed for the
> control of the thermal component of any discharge from
> such source will require effluent limitations more
> stringent than necessary to assure the pro[t]ection and
> propagation of a balanced, indigenous population of
> shellfish, fish, and wildlife in and on the body of water
> into which the discharge is to be made.

33 U.S.C. § 1326(a) (emphasis added); *accord Appalachian Power Co.
v. Train*, 545 F.2d 1351, 1371-72 (4th Cir. 1976); *Am. Littoral Soc'y v.
EPA*, 199 F. Supp. 2d 217, 237 (D.N.J. 2002). In such cases, EPA may
grant a variance for the thermal component of the discharge that
"assure[s] the protection and propagation of a balanced, indigenous
population of shellfish, fish, and wildlife in and on that body of water."
33 U.S.C. § 1326(a).

    Section 316(b) governs cooling water intake structures. 33
U.S.C. § 1326(b). It provides that standards promulgated under CWA
sections 301 or 306 and applicable to a point source "require that the
location, design, construction, and capacity of cooling water intake

---

[2] Pursuant to CWA section 301, the Agency established effluent limitations for
categories or classes of point sources based on either "the best available technology
economically achievable" or "the best conventional pollutant control technology,"
depending on the type of pollutant in question. 33 U.S.C. § 1311(b)(2)(A), (E); *see E.I.
duPont de Nemours & Co. v. Train*, 430 U.S. 112, 126-29 (1977); *Riverkeeper, Inc. v.
EPA*, 358 F.3d 174, 185 (2d Cir. 2004); *Cronin v. Browner*, 898 F. Supp. 1052, 1056
(S.D.N.Y. 1995). All existing point sources were required to meet these effluent
limitations by 1989. 33 U.S.C. § 1311(b). Under section 306 of the Act, EPA
established another set of standards, applicable to new sources, commonly referred to as
New Source Performance Standards, which are based on the "best available demonstrated
control technology." *Id.* § 1316(a)(1), (b)(1)(B), (e); *see Riverkeeper*, 358 F.3d at 185;
*Cronin*, 898 F. Supp. at 1056. Thus, for a given point source discharger, an effluent
limitation for thermal discharges may apply to it under CWA section 301 or 306.

4                 **USGEN NEW ENGLAND, INC.**

structures reflect the best technology available for minimizing adverse environmental impact." *Id.* Section 316(b) does not contain a requirement for a public hearing as do sections 316(a) and 402(a).

## 2. *The Agency's NPDES Regulations*

The Agency has promulgated a series of regulations to implement the NPDES program. *See* 40 C.F.R. § 122.1(a)(1)-(5) (2003) (generally describing the various NPDES-related regulations). *See generally id.* pts. 122-25, 129, 133, 136, 400-71, 503. Part 124 contains the procedures for the Agency's processing of NPDES permit applications and appeals, including related requests for section 316 variances. *Id.* §§ 122.2(a)(2), 124.1(a), 124.66. Under the current part 124 regulations, a person seeking an NPDES permit from the Agency must first submit an application to EPA, which should include any thermal variance requests.[3] *Id.* § 124.3(a). Once an application is found by the Agency to be complete, a draft permit is issued by the appropriate Regional Administrator, *id.* § 124.6(c), public notice of the draft permit is given, *id.* § 124.10(a)(ii), and a comment period is provided, *id.* § 124.10(b). If there is a significant degree of public interest in the draft permit, the Region must hold a public hearing. *Id.* § 124.12(a). Decisions on NPDES variance requests are ordinarily decided through the same notice-and-comment and hearing procedures as the basic permit. *Id.* § 124.15(b). Following the close of the comment period, the Region responds to comments, *id.* § 124.17(a), and issues a final permit decision, *id.* § 124.15(a). The final permit decision must be based upon the "administrative record" for the final permit decision, which is defined by regulation, *id.* § 124.18(a), and must contain the administrative record for the draft permit as well as a number of other items, including all comments received during the comment period, any written materials submitted at a hearing (if one was conducted), and a response to comments document. *Id.* § 124.18(b)(1)-(7). Within thirty days of the issuance of the final permit decision, any person who filed comments on

---

[3] In general, a thermal variance request must be filed with an application for an NPDES permit. 40 C.F.R. § 122.21(m)(6).

the draft permit or who participated in the public hearings may appeal the Region's final permit decision to the Board.[4]  *Id.* § 124.19(a).

Current part 124 regulations contain no provisions that explicitly authorize evidentiary hearings following the issuance of an NPDES permit.  In contrast, prior to certain revisions the Agency made in 2000, EPA's procedural regulations governing NPDES permit decisions specifically authorized evidentiary hearings to be held following permit issuance in certain circumstances.  *See generally* 40 C.F.R. pt. 124, subpt. E (1999).  In fact, the former regulations required that persons seeking to contest a final permit decision request such a hearing.  *See id.* § 124.91(a)(1) (1999) (allowing *requesters* of an evidentiary hearing to appeal a partial or full denial of their request for an evidentiary hearing, but providing no right to directly appeal the final permit decision prior to any such hearing request); *see also id.* § 124.74(a) (1999) (authorizing persons to request an evidentiary hearing).  Persons could appeal to the Board an adverse decision after the hearing.  *Id.* § 124.91(a)(1) (1999).  In addition, if the Region denied a hearing request in whole or in part, the requester could appeal this denial to the Board as well.  *Id.*

Hearings were not automatically granted upon request; instead, they were granted in limited, specified circumstances.  For example, where solely legal issues were raised in the request or there were no factual issues in dispute, the Regional Administrator would deny the request.  *Id.* § 124.74(b)(1) (1999).  However, as mentioned above, the requestor could then appeal such denial, and the underlying permit decision, including legal and factual issues, to the Board.  *Id.*

---

[4] In addition, "any person who failed to file comments or failed to participate in the public hearing on the draft permit may petition [the Board] for administrative review only to the extent of the changes from the draft to the final permit decision."  40 C.F.R. § 124.19(a).

6                    **USGEN NEW ENGLAND, INC.**

**3.** *The 2000 Amendments*

In 2000, the Agency amended its permitting procedures for several programs, including the NPDES program. Amendments to Streamline the National Pollutant Discharge Elimination System Program Regulations: Round Two, 65 Fed. Reg. 30,886 (May 15, 2000) (hereinafter "2000 Final Rule"); *see also* [Proposed] Amendments to Streamline the National Pollutant Discharge Elimination System Program Regulations: Round Two, 61 Fed. Reg. 65,268 (Dec. 11, 1996) (hereinafter "1996 Proposed Rule"). The amendments had been proposed in response to a 1995 presidential directive instructing all agencies to conduct a comprehensive review of the regulations administered by them and to identify those rules that were obsolete or unduly burdensome. President's Memorandum on Regulatory Reform, 1 Pub. Papers 304 (Mar. 4, 1995), *available at* 1995 WL 15155159; President's Remarks on Regulatory Reform, 1 Pub. Papers 235 (Feb. 21, 1995), *available at* 1995 WL 15155111; *see also* 1996 Proposed Rule, 61 Fed. Reg. at 65,269. The Agency's amendments, therefore, were particularly focused on revising the NPDES permitting program by "eliminat[ing] redundant regulatory language, provid[ing] clarification, and remov[ing] or streamlin[ing] unnecessary procedures which do not provide any environmental benefits." 2000 Final Rule, 65 Fed. Reg. at 30,886.

As part of this rulemaking, the Agency specifically eliminated the provisions authorizing evidentiary hearings on NPDES permit conditions following permit issuance.[5] *Id.* at 30,896-900; *see also* 1996

---

[5] The Agency did retain formal hearing requirements in certain limited contexts – for NPDES and Resource Conservation and Recovery Act ("RCRA") involuntary permit *terminations*. *See* 2000 Final Rule, 65 Fed. Reg. at 30,904 (amending part 22 to authorize hearings for termination of NPDES permits); 1996 Proposed Rule, 61 Fed. Reg. at 65,279-80 (proposing to retain hearings for involuntary permit terminations). The Agency recognized that there were significant differences between involuntary permit terminations and other permit proceedings that warranted the maintenance of formal hearings for terminations. 1996 Proposed Rule, 61 Fed. Reg. at 65,279; *see also id.* at 65,277 (discussing rationale for holding full adjudicatory hearings for administrative enforcement actions). The Agency did not retain the part 124 hearing procedures for
(continued...)

Proposed Rule, 61 Fed. Reg. at 65,275-82. The part 124 evidentiary hearing procedures were replaced with the current system, which contains a direct appeal to the Board. 2000 Final Rule, 65 Fed. Reg. at 30,887; *see also supra* Part I.A.2. The Agency implemented this change by interpreting the phrase "opportunity for public hearing" as used in CWA section 402 to allow for informal adjudication of permit applications. 2000 Final Rule, 65 Fed. Reg. at 30,896-97; 1996 Proposed Rule, 61 Fed. Reg. at 65,275. Thus, the 2000 Final Rule essentially changed the regulatory scheme for NPDES permit issuance from a formal adjudicatory scheme under sections 554, 556, and 557 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 554, 556, 557, to a system of informal adjudication not covered by APA sections 554, 556, and 557.[6]

The new procedures for NPDES permits are identical to the informal adjudication procedures that the Agency had adopted and used for many years in numerous other permit programs, e.g., the Subtitle C permit program under the Hazardous and Solid Waste Amendments to the Resource Conservation and Recovery Act ("RCRA"),[7] the Underground Injection Control program under the Safe Drinking Water

---

[5](...continued)
NPDES and RCRA permit terminations, however. Instead, EPA amended the part 22 rules, which already included procedures for holding formal hearings in a variety of administrative enforcement actions, to include NPDES and RCRA permit terminations. 2000 Final Rule, 65 Fed. Reg. at 30,904; *see also* 1996 Proposed Rule, 61 Fed. Reg. at 65,280. Thus, a permittee whose NPDES permit has been terminated may request an evidentiary hearing under part 22. *See* 40 C.F.R. §§ 22.13, .15(c).

[6] Section 554 of the APA enumerates certain procedures that are required to be followed, except in limited circumstances, "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). For example, § 554 requires that an agency "give all interested parties opportunity for – (1) the submission of facts, arguments, offers of settlement, or proposals of adjustment * * * and (2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of [the APA]." *Id.* § 554(c).

[7] 42 U.S.C. §§ 6901-6992k.

8                      USGEN NEW ENGLAND, INC.

Act ("SDWA"),[8] and the Prevention of Significant Deterioration program under the Clean Air Act ("CAA").[9]  *See* 1996 Proposed Rule, 61 Fed. Reg. at 65,276; *see also* 40 C.F.R. § 124.1(a) (2003) (describing current scope of part 124).  Thus, in amending the NPDES procedures to conform to other permit programs' procedures, the Agency brought the CWA permit mechanism into alignment with EPA's other permitting program procedures, which had been in use since at least 1980.  *See* Consolidated Permit Regulations: RCRA Hazardous Waste; SDWA Underground Injection Control; CWA NPDES, CWA Section 404 Dredge or Fill Programs; and CAA Prevention of Significant Deterioration, 45 Fed. Reg. 33290, 33,405 (May 19, 1980) (explaining that public hearings are available for all programs, but that evidentiary hearings are only available for issuances of NPDES permits).

     In the preambles to both the Proposed and Final Rules, the Agency provided a thorough, detailed rationale for changing the NPDES procedural regulations to conform with those in other permitting programs.  *See* 2000 Final Rule, 65 Fed. Reg. at 30,896-900; 1996 Proposed Rule, 61 Fed. Reg. at 65,275-79.  Although we will not reiterate the Agency's entire rationale here, we will summarize the Agency's explanation in order to provide sufficient context for our later discussions in this Order.

     In the proposal, the Agency explained that it had originally promulgated the 1979 regulations – which required formal evidentiary hearings – largely because of the holdings in three cases: *Seacoast v. Anti-Pollution League v. Costle*, 572 F.2d 872 (1st Cir. 1978), *Marathon Oil Co. v. EPA*, 564 F.2d 1253 (9th Cir. 1977), and *U.S. Steel v. Train*, 556 F.2d 822 (7th Cir. 1977).  1996 Proposed Rule, 61 Fed. Reg. at 65,276 (referring to Revision of [NPDES] Regulations, 44 Fed. Reg. 32,854, 32,855 (June 7, 1979)).  These three cases had interpreted the CWA's "opportunity for public hearing" language in conjunction with the APA and had concluded that the Agency was required to hold a

---

[8] 42 U.S.C. §§ 300h to 300h-7.

[9] 42 U.S.C. §§ 7470-7492.

USGEN NEW ENGLAND, INC.                    9

formal evidentiary hearing under CWA section 402, notwithstanding the fact that Congress had not explicitly required a formal hearing. Seacoast, 572 F.2d at 877-78; *Marathon*, 564 F.2d at 1263-64; *Train*, 556 F.2d at 833. The *Seacoast* court, in reaching this conclusion, had presumed, without benefit of clear Congressional direction on the meaning of "opportunity for public hearing," that it contemplated a trial-type hearing under APA sections 554, 556, and 557. *Seacoast*, 572 F.2d at 877. EPA explained, however, that later decisions considering similar statutory language requiring "public hearings" had concluded that Congress had *not* intended such statutory language to require formal hearing procedures. 2000 Final Rule, 65 Fed. Reg. at 30,897 (citing *Chemical Waste Management* ("*CWM*") *v. EPA*, 873 F.2d 1477 (D.C. Cir. 1989), and *Buttrey v. United States*, 690 F.2d 1170 (5th Cir. 1982)). EPA also noted that, in *CWM*, the court specifically "abandoned the presumption that trial-type are required by the APA where a statute calls for an adjudicatory hearing without explicitly requiring formal procedures." 1996 Proposed Rule, 61 Fed. Reg. at 65,276-77; *accord* 2000 Final Rule, 65 Fed. Reg. at 30,897. The Agency also pointed out that the *CWM* court had noted that the three 1970s cases[10] were decided prior to the seminal Supreme Court decision in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984).[11] 1996 Proposed Rule, 61 Fed. Reg. at 65,277; *see also* 2000 Final Rule, 65 Fed. Reg. at 30,896-97. In *Chevron*, the Supreme Court had held that an agency charged with administering a statute may adopt a reasonable interpretation of that statute where Congress has not expressed a clear intent to the contrary and that reviewing courts should give deference to such reasonable interpretations. 467 U.S. at 843.

---

[10] *Buttrey*, a 1982 opinion, was also decided pre-*Chevron*.

[11] We note that in *CWM*, the Court of Appeals for the District of Columbia Circuit overruled its former precedent, *Union of Concerned Scientists v. U.S. NRC*, 735 F.2d 1437 (D.C. Cir. 1984), a case that the court stated was "kin" to both *Seacoast* and *Marathon*. *CWM*, 873 F.2d at 1482. The *CWM* court pointed out that these three cases all predate *Chevron*, but now a *Chevron* inquiry was required. Thus, rather than presuming that a statutory "hearing" requirements must be made on the record, as was formerly done in the three cases, the court would "leav[e] it to the agency, as an initial matter, to resolve the ambiguity." *Id.*

10                    **USGEN NEW ENGLAND, INC.**

Based upon the decisions in *Buttrey*, *Chevron*, and *CWM*, the Agency concluded that it could revisit the meaning of CWA section 402(a)'s "opportunity for public hearing." *See* 2000 Final Rule, 65 Fed. Reg. at 30,896. The Agency therefore employed the two-step analysis established in *Chevron*. *Id.* Accordingly, "the Agency first examined the text, legislative history, and judicial interpretations of the Act, finding no evidence that Congress intended to require formal evidentiary hearings or that the text precludes informal adjudication of permit review petitions. Using modern due process analysis, the Agency, in the second step of its *Chevron* analysis, carefully weighed the risks and benefits of informal hearing procedures for NPDES permit review, determining that these procedures would not violate the Due Process Clause of the Constitution." *Id.*; *see also* 1996 Proposed Rule, 61 Fed. Reg. at 65,277 (analyzing the proposed regulations in light of constitutional due process requirements and citing cases regarding the minimum due process rights that parties must obtain in an agency proceeding).[12]

**B**. *Factual and Procedural Background*

On October 6, 2003, Region I issued a final permit decision to USGen for a renewal of its NPDES permit. The NPDES permit was for USGen's Brayton Point Station, a power plant that withdraws water from

---

[12] On a number of occasions, courts have held that properly constructed informal adjudicatory procedures do not violate constitutional due process rights. *CWM v. EPA*, 873 F.2d 1477, 1484-85 (D.C. Cir. 1989); *Buttrey v. United States*, 690 F.2d 1170, 1176-83 (5th Cir. 1982). The Supreme Court has stated that a due process attack on an agency's procedures involves a balancing test containing three steps: (1) "the private interest that will be affected by agency action," (2) "the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," (3) "the Government's interest including the function involved and the fiscal and administrative burdens that the additional * * * procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319 (1976); *accord CWM*, 873 F.2d at 1483. As indicated in the text above, the Agency provided an in-depth analysis of the due process considerations associated with the 2000 Final Rule in the preamble to the rule. *See* 2000 Final Rule, 65 Fed. Reg. at 30,898-900; *see also* 1996 Proposed Rule, 61 Fed. Reg. at 65,277-79.

the Taunton and Lee Rivers for cooling purposes and later discharges that water into Mount Hope Bay in Somerset, Massachusetts.[13]

On November 5, 2003, pursuant to 40 C.F.R. § 124.19(a), USGen filed a timely petition for review of this NPDES permit with the Board, challenging a number of conditions of the permit. *See* Petition for Review of NPDES Permit Issued by Region I on October 6, 2003 ("Petition"). In addition to the Petition, USGen submitted several other motions, including its Motion requesting an evidentiary hearing.[14]

In its Motion, USGen argues that it is entitled to an evidentiary hearing under the CWA as a matter of "statutory right" prior to final issuance of the permit by virtue of the decision of the United States Court of Appeals for the First Circuit in *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872 (1st Cir. 1978). Motion at 1. USGen contends that the First Circuit's decision in *Seacoast* established a right to a formal hearing under section 554(a) of the APA with respect to an application to EPA for a permit to discharge heated water under sections 316 and 402 of the CWA, which is precisely the type of permit at issue in this case. *Id.* at 2. USGen further argues that EPA, in abolishing the requirement for an evidentiary hearing in connection with NPDES permits in its 2000 Final Rule, incorrectly concluded that *Seacoast* was no longer good law. *Id.* at 2-3. USGen also relies upon a recent First Circuit case, *Dantran, Inc. v. U.S. Department of Labor*, 246 F.3d 36 (1st Cir. 2001), which was decided after the Agency amended its regulations and eliminated the process for evidentiary hearings, in support of its assertion that *Seacoast* is still good law, at least in the First Circuit. According to USGen,

---

[13] Mount Hope Bay occupies the northernmost portion of Narragansett Bay, which is a 146-square-mile bay bordering Rhode Island Sound. *See* Petition at 3. Mount Hope Bay is bordered by the States of Massachusetts and Rhode Island.

[14] Petitioner also filed a Motion for Leave to Submit Brief in Connection with Petition for Review, a Motion to Supplement the Administrative Record, and a Request for Oral Argument. In connection with our granting review of the petition and setting up a briefing schedule, we granted Petitioner's request to submit an additional brief. *See* Order Granting Review at 6-7. In an Order issued today, the Board granted USGen's Motion for Oral Argument, scheduling the argument for September 9, 2004. The Board has not yet ruled upon the Motion to Supplement the Administrative Record.

*Dantran* followed the precise *Seacoast* rationale with respect to APA section 554 hearings and therefore demonstrates the continuing validity of *Seacoast.* Motion at 1-2, 5-6.

On December 30, 2003, the Region filed a Response to the Petition. *See* EPA Region I Response to Petition for Review ("Response"). The Region filed several other documents with its Response, including an Opposition to Petitioner's Motion for Evidentiary Hearing ("Region Opposition"). In its Opposition, the Region contends that USGen's Motion should be denied for several reasons. Region Opp'n at 1. The Region first argues that, because EPA amended its regulations to no longer authorize evidentiary hearings in NPDES permit appeals, USGen's challenge to the regulations was "both brought in the wrong forum and w[as] untimely" under the CWA's section 509(b) judicial review provision.[15] *Id.* The Region also argues that USGen is precluded from even raising this issue on appeal because USGen failed to raise the issue during the public comment period on the permit and thus waived any right to raise it now. *Id.* Finally, the Region argues that USGen's analysis of the First Circuit case law is incorrect. *Id.*

Between November 2003 and February 2004, following USGen's filing of the Petition, five other entities filed motions to intervene and/or to file amicus curiae ("amicus") briefs in this matter: the Conservation Law Foundation ("CLF"); the Massachusetts Department of Environmental Protection ("MA DEP"); Save the Bay ("STB"); the Department of Attorney General of the State of Rhode Island ("Rhode Island"); and the Utility Water Act Group ("UWAG"). CLF and Rhode Island also filed objections to USGen's request for an evidentiary hearing

---

[15] The CWA contains several judicial review provisions. *E.g.*, 33 U.S.C. §§ 1319(b), 1365, 1369(b). Section 509(b), which is relevant to the issue raised in USGen's Motion, states that "[r]eview of the Administrator's action * * * (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title * * * may be had by any interested person in the Circuit Court of Appeals of the United States * * *." 33 U.S.C. § 1369(b)(1)(E). Applications for review under section 509(b), however, must be made within 120 days from the date of the Agency's "determination, approval, promulgation, issuance or denial" of such action. Id. § 1369(b)(1).

with their motions to intervene and/or file amicus briefs. *See* CLF's Objection to Petitioner's Motion for Evidentiary Hearing (Dec. 29, 2003); Memorandum in Support of Objection to Motion for Evidentiary Hearing (Dec. 29, 2003) ("CLF Mem. in Supp. of Objection"); State of Rhode Island's Objection to Petitioner's Request for Evidentiary Hearing (Dec. 29, 2003).

On February 19, 2004, the Board granted review of the Petition under 40 C.F.R. § 124.19(c). *See* Order Granting Review ("Order") at 5. In that Order, the Board also granted amicus status to the five entities listed above that had submitted requests to participate in the proceedings. *Id.* at 6-7. Additionally, the Board established a briefing schedule and stated that such briefing would be bifurcated. *Id.* at 4. The participants were instructed to focus their first set of briefs on the issue of whether or not USGen's motion for an evidentiary hearing should be granted.[16] *Id.* at 9. In particular, the Board requested participants submitting briefs on this first issue to address the following questions: (1) whether Petitioner is, in effect, challenging the amended regulations; (2) if so, whether or not the circumstances of this case meet the standard of reviewability articulated in *In re B.J. Carney Industries*, 7 E.A.D. 171 (EAB 1997), *appeal dismissed as moot,* 200 F.3d 1222 (9th Cir. 2000), and *In re Echevarria*, 5 E.A.D. 626 (EAB 1994), and why or why not; and (3) the applicability, if any, of section 509(b) of the CWA, 33 U.S.C. § 1369(b), or other applicable legal authority, on whether Petitioner may challenge this regulation at this time. *See* Order at 4. Petitioner and UWAG were allowed to file briefs on this issue (in addition to any that had previously been filed) by April 12, 2004, and the Region and the other amici in support of the permit were allowed to file briefs (in addition to any previously filed) on or before May 3, 2004. *Id.* at 9.

---

[16] Briefs on all other issues were due from Petitioner and any amicus in support of Petitioner by June 7, 2004. Order at 9. Responses from the other participants were due by June 28, 2004. *Id.* at 10. Petitioner's reply was due on or before July 12, 2004. *Id.* The Board subsequently extended the last two deadlines by approximately ten days in response to a motion from the Region. *See* Order Granting Extension of Time and Denying Enlargement of Page Limits (June 18, 2004).

14                        **USGEN NEW ENGLAND, INC.**

In response to the Order Granting Review, the Board has received the following briefs on the evidentiary hearing issue: (1) USGen's Brief in Support of Request for an Evidentiary Hearing (Apr. 12, 2004) ("USGen Brief in Support of Motion"); (2) UWAG's Amicus Curiae Brief in Support of Appellant's Motion for Evidentiary Hearing (Apr. 12, 2004) ("UWAG Brief in Support of Motion"); (3) Region I's Further Opposition to Motion for Evidentiary Hearing (Apr. 22, 2004) ("Region Further Opposition"); (4) CLF's Further Opposition to Motion for Evidentiary Hearing (May 3, 2003) ("CLF Further Opposition"); (5) State of Rhode Island's Memorandum of Law in Support of Its Objection to [USGEN's] Request for an Evidentiary Hearing (May 3, 2004) ("R.I. Memorandum in Support of Objection"); (6) STB's Amicus Brief in Objection to Motion for an Evidentiary Hearing (May 5, 2004) ("STB Brief in Objection").[17, 18] Issues raised by the initial and supplemental briefs pertinent to the evidentiary hearing issue are discussed below.

## II. *ANALYSIS*

In ruling on the Motion, we first address the Region's contention that USGen's request is untimely because USGen failed to raise the issue during the comment period on the draft permit. If the Region is correct, this would be dispositive of USGen's motion. However, because we

---

[17] STB's brief was untimely filed and therefore we will not consider it. We note, however, that STB does not make any new or unique arguments in its brief. In objecting to USGen's Motion, STB states that it fully supports the legal arguments made by the Region and Rhode Island and thus is not reiterating them. STB Br. in Objection at 1. The bulk of STB's brief focuses on the factual and policy reasons for not further delaying the current matter by holding an evidentiary hearing. Substantially similar arguments are contained in CLF's briefs, *e.g.*, CLF Mem. in Supp. of Objection at 3-5, as well as Rhode Island's, *e.g.*, R.I. Mem. in Supp. of Objection at 16-19.

[18] More recently, the Taunton River Watershed Alliance, Inc. and the Kickemuit River Council each submitted requests to participate as amici in this matter, both of which the Board granted. *See* Order (EAB, May 4, 2004); Order (EAB, May 27, 2004). Their requests were received on or after the time for filing briefs on the evidentiary hearing issue and neither organization filed briefs specifically addressing the evidentiary hearing issue.

accept USGen's request for an evidentiary hearing as timely in the particular circumstances of this case, we next consider whether USGen's request is, in effect, a challenge to EPA's amended regulations. Finding in the affirmative, we analyze the applicability of the CWA section 509(b) judicial review provision to USGen's challenge to the regulations. Relying in part on our determination that section 509(b) is relevant to USGen's Motion, we then consider whether USGen's request meets the standard of reviewability we articulated in *B.J. Carney* and *Echevarria*. Finally, we address several other arguments raised by the participants, including USGen's constitutional due process claims.

**A.** *Timeliness of USGen's Request for an Evidentiary Hearing*

    **1.** *Participants' Arguments*

According to the Region, because USGen did not request an evidentiary hearing during the public comment period on the draft permit, USGen's request for an evidentiary hearing was not timely raised. Region Opp'n at 1, 4; Region Further Opp'n at 9-11. The Region argues that the part 124 regulations require a petitioner to "demonstrate that 'any issues being raised [on appeal] were raised during the public comment period to the extent required by these regulations * * *.'" Region Opp'n at 4 (quoting 40 C.F.R. § 124.19(a)). The Region also points out that the NPDES regulations require commenters to "'raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their positions' by the close of the public comment period." *Id.* (quoting 40 C.F.R. § 124.13). Finally, the Region points out that by waiting until now to request an evidentiary hearing, USGen will cause significant delay in the proceedings. *Id.*; Region Further Opp'n at 11 n.15.

USGen argues that the Region's position is incorrect because "prior to the Region's issuance of a final permit to which [USGen] objected, [USGen] had no reason (and no regulatory basis) for seeking such a hearing." USGen Br. in Supp. of Motion at 9. USGen also points out that under the former regulations, which provided for an evidentiary hearing, requests for a hearing were made after the issuance of the final permit decision. *Id.* at 10 n.12 (citing 40 C.F.R. § 124.74 (1999)).

16                    **USGEN NEW ENGLAND, INC.**

USGen further contends that the section 124.13 requirement to "raise all ascertainable issues" refers only to "those issues affecting the conditions of a draft permit and the procedural arguments relating to the Region's decision to prepare, or not to prepare, a draft permit." *Id.* at 10. The remaining participants did not address this issue in their briefs.

### 2. *Analysis*

The Board generally requires that persons seeking review of a permit under part 124 demonstrate "that any issues being raised were raised during the public comment period (including any public hearing) to the extent required by these regulations * * *." 40 C.F.R. § 124.19(a); *accord In re City of Moscow*, 10 E.A.D. 135, 141 (EAB 2001); *In re New England Plating Co.*, 9 E.A.D. 726, 730 (EAB 2001). The Board has also stated that "[p]articipation during the comment period must conform with the requirements of section 124.13." *In re Avon Custom Mixing Servs., Inc.*, 10 E.A.D. 700, 705 (EAB 2001); *New England Plating*, 9 E.A.D. at 730; *see also In re City of Phoenix*, 9 E.A.D. 515, 524-25 (EAB 2000) ("[i]n construing the requirements of section 124.19, the Board has done so in conjunction with section 124.13"), *appeal dismissed per stipulation*, No. 01-70263 (9th Cir. Mar. 21, 2002). That section requires that "[a]ll persons, including applicants, who believe any condition of a draft permit is inappropriate * * * raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their position by the close of the public comment period * * *." 40 C.F.R. § 124.13 (2003); *accord Avon*, 10 E.A.D. at 705; *City of Moscow*, 10 E.A.D. at 141. Consequently, the Board has consistently declined to review issues or arguments in petitions that fail to satisfy this fundamental requirement. *Avon*, 10 E.A.D. at 705; *New England Plating*, 9 E.A.D. at 730; *City of Phoenix*, 9 E.A.D. at 524; *In re Fla. Pulp & Paper Ass'n*, 6 E.A.D. 49, 53 (EAB 1995).

The participants' briefs indicate that USGen did not request an evidentiary hearing during the comment period. Region Further Opp'n at 9; USGen Br. in Supp. of Motion at 9. We believe USGen could have reasonably ascertained during the comment period both that it was interested in an evidentiary hearing concerning the permit and that the Region had not evidenced any intention to hold one. It would have been

prudent, at a minimum, to raise this issue during the comment period. On the other hand, as USGen points out, requests for evidentiary hearings were formerly submitted to the Agency *after* permit issuance, and, as such, were not considered issues relative to the permit for purposes of section 124.13.[19] USGen Br. in Supp. of Motion at 10 n.12 (citing 40 C.F.R. § 124.74 (1999)). The previous regulations stated that "[w]ithin 30 days following the service of notice of the Regional Administrator's final permit decision * * *, any interested person may submit a request to the Regional Administrator * * * for an evidentiary hearing to reconsider or contest that decision." 40 C.F.R. § 124.74(a) (1999). Several Board cases decided under the former regulations similarly explained this procedure. *E.g., In re City of Port St. Joe*, 7 E.A.D. 275, 282-84 (EAB 1997); *In re Broward County*, 6 E.A.D. 535, 536 & n.2 (EAB 1996); *see also City of Moscow*, 10 E.A.D. at 140 n.20 (explaining differences between former and amended regulations); *City of Phoenix*, 9 E.A.D. at 525 & n.14 (same). Because parties could request an evidentiary hearing only after the Region's decision under the former part 124 regulations and our cases thereunder, and because no clear Board precedent with respect to this question has been issued since the regulations were amended, we decline to conclude for purposes of this proceeding that the request for an evidentiary hearing was not timely raised.[20] However, we believe that the better reading of the current regulations is that any similar issue with regard to the NPDES permit procedures must be raised during the comment period on the draft permit. *See In re Cargill*, 4 E.A.D. 31, 32 (EAB 1992) (finding that alleged problems in public hearing procedures were reasonably ascertainable during public comment period and thus issue was not preserved for review). Nonetheless, as we mentioned above, because we have not

---

[19] We note that USGen's reliance on the former regulations with respect to the question of the appropriate time frame for evidentiary hearing requests appears to belie its claim that its request for an evidentiary hearing is not a challenge to the regulations. Instead, its reliance on these regulations further emphasizes the relevance of the part 124 regulations to its request for a hearing.

[20] Our decision to consider USGen's request as timely does not in any way reflect on our opinion as to the merits of the Motion itself. Our discussion of the merits of USGen's Motion follows in Parts II.B through E below.

previously spoken to this question since the Agency amended part 124,
we will accept USGen's request for an evidentiary hearing as timely
raised in this case.

**B.** *Is USGen's Motion, in Effect, a Challenge to the Amended
Regulations?*

    **1.** *Participants' Arguments*

        The Board, in its Order Granting Review, asked the participants
to address the question of whether or not USGen's motion requesting an
evidentiary hearing is essentially a challenge to EPA's 2000 amended
regulations, which streamlined the permit procedures and eliminated the
evidentiary hearing procedures. Order at 4. The Region, Rhode Island,
and CLF all argue in the affirmative. Region Opp'n at 1-3; Region
Further Opp'n at 2-6; R.I. Mem. in Supp. of Objection at 3-11; CLF
Mem. in Supp. of Objection at 3. Both the Region and Rhode Island
argue that because the express intent and effect of the 2000 Final Rule
was to eliminate the use of evidentiary hearings in connection with
NPDES permit appeal proceedings, USGen's Motion must logically be
a challenge to the amended NPDES regulations. Region Further Opp'n
at 2-3; R.I. Mem. in Supp. of Objection at 4-6; *see also* CLF Mem. in
Supp. of Objection at 2.

        USGen, on the other hand, "does not contend that it is entitled to
a hearing under EPA's regulations; nor is [it] asking that the regulations
be modified to direct such a hearing. [USGen] instead relies on the
express statutory right to a hearing provided by [s]ections 316 and 402
of the [CWA]." USGen Br. in Supp. of Motion at 11; *see also* UWAG
Br. in Supp. of Motion at 3-4. USGen and UWAG argue that this
"statutory right" is grounded on the First Circuit's interpretation of the
provisions in sections 316 and 402 of the CWA stating that the Agency
may "after opportunity for public hearing" issue an NPDES permit. *See*
USGen Br. in Supp. of Motion at 11-12 (relying on the First Circuit's
decision in *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872 (1st
Cir. 1978)); UWAG Br. in Supp. of Motion at 3-4; *see also* discussion of
USGen's Motion *supra* Part I.B. USGen further argues that the
regulations, on their face, do not *preclude* evidentiary hearings and, even

if they did, such interpretation would be prohibited by principles of statutory construction. USGen Br. in Supp. of Motion at 13-14; *see also* Motion at 5 (arguing that EPA did not make a permissible construction of the CWA in its 2000 rulemaking); UWAG Br. in Supp. of Motion at 5 (contending that "nothing in the streamlined regulations forbids the agency from holding an evidentiary hearing").

Related to these arguments, USGen asserts that the Board, pursuant to a delegation of authority from the Administrator to make final permit decisions for the Agency, has the authority to order evidentiary hearings. USGen Br. in Supp. of Motion at 12-13. USGen also cites to the fact that the Board has ordered evidentiary hearings on other occasions based on similar delegations, in particular for section 106 reimbursement petitions under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. *Id.* at 13.

In response to USGen's assertion that it is relying on a statutory right grounded on First Circuit case law, both the Region and Rhode Island argue that the law has changed since the First Circuit's decision in *Seacoast*. Region Further Opp'n at 11; R.I. Mem. in Supp. of Objection at 6. Both argue that the Supreme Court's decision in *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) has altered the legal underpinnings of *Seacoast*. Region Further Opp'n at 11-15; R.I. Mem. in Supp. of Objection at 6-11. As for USGen's contention that the regulations do not preclude evidentiary hearings, Rhode Island argues that because the 2000 Final Rule eliminated such hearings, USGen's position must be read as a challenge to the regulations themselves. R.I. Mem. in Supp. of Objection at 5-6. The Region essentially agrees with Rhode Island, contending that, even though the regulations themselves do not expressly state that evidentiary hearings are precluded, the 2000 Final Rule intended that the new regulations established a procedural "ceiling" beyond which no further procedures would be provided. Region Further Opp'n at 3. In this regard, the Region points out that the Agency gave notice in its proposal that "[i]f EPA decides to issue the final rule as proposed today, there will be no further opportunity to request an evidentiary hearing * * *." *Id.* at 3 n.1 (quoting 1996 Proposed Rule, 61 Fed. Reg. at 65,281). Finally, the Region responds to

20                         **USGEN NEW ENGLAND, INC.**

USGen's assertion that the Board could convene evidentiary hearings
under its delegated authority by arguing that previous EAB-convened
evidentiary hearings were granted for matters not covered by the relevant
regulations, whereas here, granting a hearing would be *contrary* to the
intention of the Agency as manifested in the current regulations. *Id.* at
4 & n.3.

### 2. *Analysis*

As recounted in Part II.B.1 above, the participants have presented
a variety of arguments in addressing the Board's question of whether
USGen's Motion was, in effect, a challenge to the 2000 Final Rule. We
will address each of these arguments below.

#### a. *USGen's Own Arguments Demonstrate That It Is*
#### *Challenging the Amended Regulations*

Despite USGen's arguments to the contrary in its supporting
brief, it is clear from USGen's original motion requesting an evidentiary
hearing that it is, in essence, challenging the 2000 amendments to the part
124 regulations. The arguments USGen makes in its Motion focus on
why the 2000 amendments were contrary to law or, at a minimum, to
First Circuit case law.

For example, USGen argues that it had a statutory right to an
evidentiary hearing "established by the [*Seacoast*] decision * * * and
recently affirmed in *Dantran*. The First Circuit issued the *Dantran*
decision <u>after</u> EPA had eliminated the process for evidentiary hearings
[in the 2000 rule]. Accordingly, EPA must still provide an evidentiary
hearing when requested by a Permittee in the First Circuit." Motion at 1-
2 (internal citations omitted). Yet, clearly the 2000 amendments
contained no reservation of a right to an evidentiary hearing generally, or
in states within the First Circuit. *See generally* 2000 Final Rule, 65 Fed.
Reg. 30,886. USGen also claims that EPA's reliance on "[t]he supposed
progress of the law" to amend the part 124 regulations in 2000 was in
error as "none of those [other] decisions rendered *Seacoast* bad law." *Id.*
at 2. USGen further asserts that "EPA was not making a permissible
construction of the applicable statute in its 2000 rulemaking." *Id.* at 5.

This is a direct challenge to the 2000 amendments and the legal analysis supporting them. Although USGen now attempts to claim that it is not challenging the 2000 rulemaking, its original motion, in repeatedly referring to the 2000 amendments to the part 124 regulations and challenging their premises, undercuts its current contentions.

**b.** *Amendments to the Regulations Were Intended to Eliminate Evidentiary Hearings in NPDES Permit Approval Actions*

In amending the regulations governing NPDES permit actions in 2000, the Agency clearly intended to eliminate evidentiary hearings associated with permit issuance. In fact, it seems apparent that this was one of the major purposes of the amendments. USGen's request, therefore, runs squarely afoul of the amendments (and final rule) and thus must necessarily be viewed as a challenge to that rule.

As we explained above, *see supra* Part I.A.3, in the proposed rule, the Agency explained that it was proposing to interpret the phrase "opportunity for public hearing" as used in section 402 of the CWA to mean something other than a full-blown evidentiary hearing and thus was planning to *"eliminate as unnecessary* the existing procedures for conducting formal evidentiary hearings on NPDES permit conditions." 1996 Proposed Rule, 61 Fed. Reg. at 65,275 (emphasis added). The Agency minutely described its rationale for this interpretation, including a detailed consideration of the statute itself and relevant case law.[21] *Id.* at 65,276-79. Likewise, in the final rule, EPA provided significant responses to the comments on this proposed change and reiterated in detail its rationale as to why it was eliminating procedures for evidentiary hearings connected with the issuance of NPDES permits.[22] 2000 Final

---

[21] *See* discussion *supra* Part I.A.3.

[22] "It is well established that an agency may change course, even absent any statutory change, as long as it explains its reasons for doing so." *Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs*, 345 F.3d 1334, 1352 (Fed. Cir. 2003); *accord Harrington v. Chao*, 280 F.3d 50, 59 (1st Cir. 2002) ("Agencies do have leeway to
(continued...)

**USGEN NEW ENGLAND, INC.**

Rule, 65 Fed. Reg. at 30,896-900.   The Agency then categorically eliminated all evidentiary hearing procedures from part 124.   *Id.* at 30,900.

This is not a case where the removal of a procedural requirement was either incidental or unintentional.  In fact, in both the proposed and final rules, the Agency clearly stated that one of the main purposes of the 2000 amendments was to eliminate evidentiary hearings and the associated procedures in (former) Subpart E.  The Agency's intent is apparent both from the background discussions in each of the Federal Register notices[23] as well as the fact that a significant portion of both preambles addressed this one particular change.  *See* 2000 Final Rule, 65 Fed. Reg. at 30,896-900; 1996 Proposed Rule, 61 Fed. Reg. at 65,275-82. As the Region noted, the Agency explicitly stated in the proposal that there would be "no further opportunity to request an evidentiary hearing" if the final rule was issued as proposed.  Region Further Opp'n at 3 n.1 (quoting 1996 Proposed Rule, 61 Fed. Reg. at 65,281).

---

[22](...continued)
change their interpretations of laws * * * provided they explain the reasons for such change and provided that those reasons meet the applicable standard of review."); *see also Pub. Interest Research Group v. FCC*, 522 F.2d 1060, 1065 (1st Cir. 1975); *Maine v. Civil Aeronautics Bd.*, 520 F.2d 1240, 1245 (1st Cir. 1975) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored * * *." (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970))).  As we mention several times in this Order, the Agency has provided a detailed analysis explaining its reasons for reinterpreting the statute and amending the part 124 regulations.  *See, e.g., supra* Part I.A.3.

[23] The only revision to the procedural rules specifically described in the "Background" sections of both Federal Register notices is the replacement of the evidentiary hearing procedures with a direct appeal to the Board.  2000 Final Rule, 65 Fed. Reg. at 30,887; 1996 Proposed Rule, 61 Fed. Reg. at 65,269.  All other changes were generally referred to as revisions to "eliminate redundant requirements, remove superfluous language, provide clarification, and remove or streamline unnecessary procedures which do not provide any environmental benefits."  2000 Final Rule, 65 Fed. Reg. at 30,887.

Not only did the Agency explicitly state during the rulemaking process that the 2000 Final Rule was intended to eliminate evidentiary hearings altogether, but the amended regulations' language itself also strongly implies that evidentiary hearings will no longer be held. *See* 40 C.F.R. § 124.21(b), (c). The effective date provision of the amended regulations states that "EPA eliminated the previous requirement for NPDES permits to undergo an evidentiary hearing after permit issuance * * * on June 14, 2000." *Id.* § 124.21(b). This section further provides that, although evidentiary hearings would still be held (pursuant to the former procedural regulations) for any permit decisions for which a request for an evidentiary hearing had already been granted prior to the effective date of the 2000 Final Rule, "[f]or any NPDES permit decision for which a request for evidentiary hearing was filed on or prior to June 13, 2000 but was neither granted nor denied prior to that date, the Regional Administrator *shall*, no later than July 14, 2000, notify the requester that the request for evidentiary hearing is being returned without prejudice."[24] *Id.* § 124.21(c)(3) (emphasis added). By requiring *all* pending requests for evidentiary hearings to be returned, rather than allowing the Region to grant some requests at its discretion, the rule strongly implies that evidentiary hearings are no longer an option.

The removal of subpart E – the subpart containing all the Agency's procedures for evidentiary hearings – in its entirety from the NPDES regulatory provisions in the 2000 amendments provides telling evidence that the Agency no longer intended to allow any evidentiary hearings in connection with NPDES permit issuance. *See* 2000 Final Rule, 65 Fed. Reg. at 30,912. The elimination of the mechanism at 40 C.F.R. § 124.81 (1999) authorizing the assignment of administrative law judges ("ALJs") to serve as presiding officers over such hearings is

---

[24] In such cases, the requester was allowed to file an appeal with the Board pursuant to the new regulations. 40 C.F.R. § 124.21(c)(3); *see also In re City of Moscow*, 10 E.A.D. 135, 138 n.14 (EAB 2001) (noting filing of timely appeal where City's request for evidentiary hearing was returned pursuant to the newly amended part 124 regulations and City shortly thereafter filed appeal with Board).

24                    **USGEN NEW ENGLAND, INC.**

especially indicative of the Agency's intent.[25]  Had the Agency intended
to allow evidentiary hearings to be held on occasion, as suggested by
USGen, the more likely course would have been for the Agency to retain
the regulations setting forth hearing procedures and authorizing ALJs to
preside over them, rather than eliminating the mechanism for conducting
such hearings.  In fact, in circumstances where the Agency wanted to
preserve the availability of an evidentiary hearing, i.e., for permit
terminations, it made provision for such a possibility by authorizing
hearings pursuant to part 22.  *See supra* note 5.  Notably, no such
provision was made in connection with NPDES permit issuances.

          In sum, the main purpose of the 2000 Final Rule as evidenced by
the preamble to both the proposed and final rules, EPA's statement in the
proposal that evidentiary hearings would no longer be available should
such hearings be eliminated in the final rule, the rule's very language, as
well as the fact that all the procedural regulations governing evidentiary
hearings (including provisions authorizing ALJs to preside over the
hearings) were removed by the rulemaking process, are all indices of the
Agency's clear intention to remove from part 124 via the 2000
amendments all rights to an evidentiary hearing following NPDES permit
issuance, even in states within the First Circuit.  Consequently, USGen's
November 2003 request for an evidentiary hearing – the very right that
was removed three years earlier from the regulations via the rulemaking
process – must be considered a challenge to the rule.

          **c.**  *The Statutory Language upon Which USGen Relies
               Is the Same Language EPA Interpreted in the 2000
               Rule in Reaching the Opposite Conclusion*

     Not only does USGen's request for an evidentiary hearing run
counter to the intention of the Agency's regulations, thereby constituting
a challenge to those regulations, but also, in arguing that the right to an
evidentiary hearing is "statutorily based," USGen seemingly ignores the

---

     [25] USGen's argument that prior to the 2000 amendments "evidentiary hearings
were routinely conducted by EPA's Regions under the same delegation of authority that
exists today," USGen Br. in Supp. of Motion at 13, fails to consider the essential role of
the ALJs in those hearings.

problem that the statutory language upon which it relies for this "right" is the very same language EPA interpreted in its 2000 rulemaking as *not* requiring an evidentiary hearing. USGen's interpretation of this statutory phrase is completely antithetical to the interpretation articulated by the Agency in the 2000 Final Rule, bolstering the conclusion that USGen's arguments are in the nature of a challenge to that rule.

USGen's argument that it has a statutory right to a hearing relies almost exclusively on the First Circuit's interpretation, in *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872 (1st Cir. 1978), of the statutory phrase "opportunity for public hearing" used in sections 316(a) and 402 of the CWA. USGen Br. in Supp. of Motion at 5 (citing *Seacoast*, 572 F.2d at 878). In that 1978 case, the First Circuit considered whether the Agency was required to follow the APA's formal adjudicatory procedures[26] in order to meet the public hearing requirement of sections 316(a) and 402.[27] *Seacoast*, 572 F.2d at 876. The First Circuit held that "the resolution of th[e] issue turn[ed] on the substantive nature of the hearing Congress intended to provide." *Id.* Presuming that unless a statute specifies otherwise, an adjudicatory hearing subject to judicial review must follow the APA's formal hearing requirements, the First Circuit, finding no statutory language or congressional intent to rebut its presumption, concluded that the APA's formal hearing requirements did

---

[26] The APA's formal hearing procedures are contained in 5 U.S.C. §§ 554, 555, and 557. *See also supra* note 6 and accompanying text.

[27] The *Seacoast* court noted that there was some confusion as to whether the matter was a proceeding pursuant to section 316 or section 402. 572 F.2d at 875 n.3. It concluded that it did not make a difference because both sections contain the same "after opportunity for public hearing" language and "the substantive character of the decision" under each provision is extremely similar. *Id.* Similarly, in the current matter, USGen did not specify, in its initial Motion, under which section its request was brought. *See generally* Motion. From its supplemental brief, it appears that USGen is requesting a hearing pursuant to both sections. USGen Br. in Supp. of Motion at 11. Because the procedural regulations for section 316(a) thermal variances are inextricably intertwined with the basic NPDES regulations, and because one of USGen's primary concerns in the Petition relates to the thermal variance conditions, it seems logical to assume that USGen's request for an evidentiary hearing has been brought under sections 316(*a*) and 402(a). We, like the *Seacoast* court, do not believe it makes a difference here.

apply to the CWA section 316(a) and 402 proceedings. *Id.* at 877-78. It is upon this holding that USGen relies for its statutory right.

As we discussed above, *see* Part II.B.2.b, the Agency interpreted this same statutory phrase – "after opportunity for public hearing" – in the 2000 Final Rule. The Agency, after considerable analysis of the history of this provision, including a discussion of the *Seacoast* decision, concluded that the statutory phrase could be read to only require informal hearings prior to the issuance of NPDES permits rather than formal evidentiary hearings. 2000 Final Rule, 65 Fed. Reg. at 30,896-900; *see also* 1996 Proposed Rule, 61 Fed. Reg. at 65,275-80. In particular, the Agency stated that "providing for informal hearings prior to issuance of NPDES permits is a reasonable interpretation of section 402(a)." 2000 Final Rule, 65 Fed. Reg. at 30,898; *see also id.* at 30,896 ("[T]he Agency has concluded that informal hearing procedures satisfy the hearing requirement of section 402(a)."). As we concluded above, in interpreting this statutory phrase to mean informal hearings, the Agency specifically stated and intended that the phrase not include the right to formal APA section 554, 555, and 557 hearings. *See* discussion *supra* Part II.B.2.b.

Accepting USGen's argument that the phrase "opportunity for public hearing" in CWA section 402 (and section 316(a)) denotes a formal evidentiary hearing would necessitate rejecting EPA's interpretation of the same phrase in the 2000 Final Rule. Consequently, USGen's "statutorily-based" request can only be read as a challenge to the 2000 Final Rule.

### d. *The Amended Regulations Eliminating Evidentiary Hearings are Preclusive*

In a further effort to avoid the implication that it is, in effect, challenging the 2000 Final Rule, USGen argues that the elimination of the provision for evidentiary hearings does not preclude such hearings as part of the appeals process. *See* U.S. Gen Br. in Supp. of Motion at 13-14. We disagree, and accordingly conclude that USGen's insistence on a hearing must be viewed as a challenge to the rule itself.

**USGEN NEW ENGLAND, INC.**                                     27

As both Rhode Island and the Region argue, R.I. Mem. in Supp. of Objection at 4-6; Region Further Opp'n at 3 & n.1, and as we have found above in Part II.B.2.b, there are several indices demonstrating the Agency's intent to preclude evidentiary hearings following the issuance of an NPDES permit. The regulations themselves clearly imply, if not state altogether, that evidentiary hearings are eliminated *in toto*.[28] *See* 40 C.F.R. § 124.21(b), (c)(1)-(4); *see also* discussion *supra* Part II.B.2.b. It is also clear from the preamble to the final rule (and the proposed rule) that the intention of the 2000 amendments was to eliminate the availability of this procedure. 2000 Final Rule, 65 Fed. Reg. at 65281 ("If EPA decides to issue the final rule as proposed today, there will be no further opportunity to request an evidentiary hearing and the existing procedural rules will be deleted from the CFR."); *see also* additional discussion and citations *supra* Part II.B.2.b. Moreover, by removing all traces of the procedural regulations governing evidentiary hearings, the Agency demonstrated a clear intention to preclude evidentiary hearings. *See* 2000 Final Rule, 65 Fed. Reg. at 30,912; *see also* discussion *supra* Part II.B.2.b.

Not only did the preamble to the 2000 Final Rule contain a detailed legal analysis of the amendments to the part 124 evidentiary hearing regulations, it also articulated at length the rationale behind the Agency's legal-policy choice, including a discussion of the perceived benefits that such a regulatory change would have.[29] 2000 Final Rule, 65

---

[28] USGen disputes that the regulations in any way suggest that evidentiary hearings are precluded. Br. in Supp. of Motion at 13-14. Specifically, USGen relies upon § 124.21(b), which states that "EPA eliminated the previous requirement for NPDES permits to undergo an evidentiary hearing after permit issuance * * * on June 14, 2000." *Id.* (citing 40 C.F.R. § 124.21(b)). USGen contends that "[t]his provision is not a statement that hearings are precluded." Br. in Supp. of Motion at 14. While we agree that this regulatory language, standing alone, might not be preclusive, as we explain further above, there is sufficient contextual information, in both the language of the remainder of this regulatory section, as well as the history and intent of this regulatory text, to establish that the 40 C.F.R. § 124.21(b) language was intended to be preclusive.

[29] The Agency also considered potential downsides to the amendments. For example, the Agency carefully considered whether switching to informal adjudicatory

(continued...)

28                 USGEN NEW ENGLAND, INC.

Fed. Reg. at 30,898-900; *see also* 1996 Proposed Rule, 61 Fed. Reg.
at 65,277-80. This discussion also makes clear that EPA intended to
completely remove the right to evidentiary hearings in NPDES permit
issuance proceedings.

In discussing the benefits of the 2000 amendments removing the
evidentiary hearing procedures from part 124, the Agency emphasized
that there was considerable public interest in an expedited process for the
issuance of NPDES permits. 2000 Final Rule, 65 Fed. Reg. at 30,899.
The Agency noted that the opportunity to request evidentiary hearings,
in place since 1979, had led to significant delays in permit issuance. *Id.*
The new amendments would "allow needed permit improvements to take
effect sooner." *Id.* The Agency had more fully elaborated on this point
in the proposed rule, calculating that, under the pre-2000 procedures, the
average appeal time was eighteen to twenty-one months, with some
hearing requests pending with the Agency for more than five years. 1996
Proposed Rule, 61 Fed. Reg. at 65,278. This essentially meant that many
of the permit limits did not take effect until well into the five-year permit
term. *Id.* For new sources and dischargers, this meant they could not
begin to discharge at all until the appeal issues were resolved. *Id.* For
existing sources, because contested new or modified permit limits could
not take effect until the appeal issues were resolved, this lag time during
appeals resulted in lengthy stays of more stringent effluent limits that had
been intended to protect water quality. *Id.*; *see also* 2000 Final Rule, 65

─────────────────

[29](...continued)
procedures would significantly affect the risk of error in NPDES review determinations
and concluded that it would not. 2000 Final Rule, 65 Fed. Reg. at 30,898-99 *Id.* The
Agency noted that the absence of a right to oral cross-examination, arguably the most
important concern in this regard, would not significantly increase the risk of error
because a party could, under the new regulations, "present written evidence to contradict
the assumptions, data, and analysis of the opposing expert," which the Agency believed
would "more efficiently and reliably reveal any error or bias in the expert's analysis or
conclusion than would an analysis of the expert's courtroom demeanor." *Id.* at 30,899.
The Agency also noted that concerns that the new procedures would not afford parties
sufficient time to develop evidence necessary to support a petition for review were
unfounded, as these same procedures were currently used in the review and granting of
RCRA and UIC permits and such procedures had not been found to be a problem in those
permit proceedings. *Id.*

Fed. Reg. at 30,899 ("The public interest in expediting the process of permit review, thus, lies, in part, in minimizing the time during which inadequate expired permits remain in effect.").

Another benefit of the new procedures would be to "make public participation more affordable." 2000 Final Rule, 65 Fed. Reg. at 30,899. EPA observed that because "the lengthy formal hearing process effectively requires all interested parties to obtain legal counsel and spend a significant amount of time to request, prepare for, and conduct a trial-type hearing before an ALJ, * * * the formal process may pose a barrier to citizen involvement in the NPDES permit process." 1996 Proposed Rule, 61 Fed. Reg. at 65,278. The Agency believed that switching to the informal adjudicatory procedures would "promote sustainable public participation" by minimizing those activities for which legal counsel is necessary and expediting the entire process so that citizen groups would only need to commit significant resources for a short duration. 2000 Final Rule, 65 Fed. Reg. at 30, 989-900.

Finally, the Agency stated that the evidentiary hearing process had represented "a significant drain on Agency resources" and "with little or no apparent gain in the quality of the decision-making." 1996 Proposed Rule, 61 Fed. Reg. at 65,278. EPA noted that for those permits where only legal issues are raised, it makes more sense to raise the issues initially before the Board. *Id.* For those issues where the Region has made a clear factual error, the Board could remand the issue back to the Region for further consideration including additional development of the administrative record, as is done in RCRA, Underground Injection Control, or Prevention of Significant Deterioration permits. *Id.*

In sum, EPA concluded that the new procedures, including the public hearing process, would be "substantially less burdensome to all parties involved than the evidentiary hearings that they would replace." 2000 Final Rule, 65 Fed. Reg. at 30,900. It is clear from these policy considerations, therefore, that the Agency intended that evidentiary hearings would no longer be held in the context of NPDES permit

30                    **USGEN NEW ENGLAND, INC.**

issuances.[30]  Accordingly, USGen's argument that the elimination of the
provision for evidentiary hearings was not preclusive would run directly
counter to the policy considerations underlying the amendments and is
in effect a challenge to the 2000 Final Rule.[31]

### e. Hearings Under Other Statutes Are Irrelevant

USGen also argues that the Board has the authority to develop
evidentiary hearing procedures and has done so to resolve issues raised
under other statutes, in particular, for CERCLA section 106(b)
reimbursement petitions, 42 U.S.C. § 9606(b).  USGen Br. in Supp. of
Motion at 13-15.  Whether or not the Board has authority to convene
evidentiary hearings in other matters under other statutes and statutory
provisions is irrelevant here.  The Agency, through an extensive,
painstaking rulemaking process, has clearly made a legal-policy
determination to interpret the NPDES provisions of the CWA to preclude
evidentiary hearings in NPDES permit appeals.  For the reasons
explained more fully below, the Board will not contravene the Agency's
purposeful interpretation of the statute by establishing hearing procedures
and granting a hearing here.

We note, moreover, that the fact that the Board has directed that
evidentiary hearings be held, on occasion, in the context of CERCLA

---

[30] We note that the Board's statement as to the inappropriateness of using a
permit appeal to challenge the validity of a regulation extends to the policy judgments
that underlie them.  *In re City of Port St. Joe*, 7 E.A.D. 275, 286 (EAB 1997).

[31] In a related argument, USGen contends that if the Agency's 2000 Final Rule
does preclude the right to a full-blown evidentiary hearing, it is contrary to principles of
statutory construction.  USGen Br. in Supp. of Motion at 14.  USGen does not explain
what principles of statutory construction would be violated by such an interpretation of
the regulations; instead, it reiterates its same argument, discussed above, that the
interpretation would be contrary to *"Seacoast's* interpretation of statutory requirements."
*Id.*  Because this argument appears to be a repetition of USGen's earlier arguments,
which we have already addressed, we will not discuss it further.

section 106(b) reimbursement petition proceedings[32] is inapposite to the NPDES permit-issuance setting. Unlike the Board's usual role as an appellate tribunal in enforcement and permit cases, in CERCLA section 106(b) cases, the Board exercises initial decisionmaking authority.[33] Because the Board essentially exercises original jurisdiction in such matters, in some cases factual records specific to the reimbursement petition may not be fully developed, as they would be in the context of a typical permit or enforcement matter. Consequently, in those CERCLA reimbursement matters where the facts are underdeveloped or unclear, the Board may direct that an evidentiary hearing be held to develop those

---

[32] *E.g.*, *In re Tiger Shipyard*, CERCLA § 106(b) Petition No. 96-3, slip op. at 4-5 (EAB, Apr. 24, 2001) (Preliminary Decision), *available at* http://www.epa.gov/eab/orders/tigerpd.pdf; *In re Dico, Inc.*, *Des Moines TCE Site*, CERCLA § 106(b) Petition No. 95-1, slip op. at 2 n.2 (EAB, Sept. 22, 1997) (Order Dismissing Petition for Reimbursement) (noting that an evidentiary hearing had been scheduled to resolve certain factual issues), *available at* http://www.epa.gov/eab/orders/dico.pdf; *see also In re Tamposi Family Investments*, 6 E.A.D. 106, 118 (EAB 1995) (stating that CERCLA does not create a right to an evidentiary hearing but that the Board has discretion to decide to hold one in a particular case).

[33] Under section 106(a), certain federal agencies, including EPA, have the authority to issue orders requiring potentially responsible parties to abate "an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." 42 U.S.C. § 9606(a); *see Dico, Inc. v. Diamond*, 35 F.3d 348, 349 & n.1 (8th Cir. 1994). Section 106(b)(2) of CERCLA allows any person who has complied with such an order to petition the Board for reimbursement of the reasonable costs incurred in complying with the order, plus interest, where it can demonstrate that it was not liable for the response costs under CERCLA section 107(a), or that the selection of the ordered response action was arbitrary, capricious, or otherwise not in accordance with law. *See* 42 U.S.C. § 9606(b)(2)(A), (C), (D); Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 29, 1987), *reprinted in* 42 U.S.C. § 9615 note (1988) (delegating the President's authority to implement CERCLA section 106(b) to the EPA); *see also Dico*, 35 F.3d at 349. *See generally In re B&C Towing Site, The Sherwin-Williams Co.*, 6 E.A.D. 199, 205 n.8 (EAB 1995) (explaining the history of the delegation of the President's authority under CERCLA section 106(b) down to the Board). The Board issues final decisions granting or denying petitions for reimbursement submitted under section 106(b), *see* Revised Guidance on Procedures for Submitting CERCLA Section 106(b) Petitions and on EPA Review of Those Petitions, 61 Fed. Reg. 55298 (Oct. 9, 1996), which are then reviewable by federal district courts, *see* 42 U.S.C. § 9606(b)(2)(B).

32                              USGEN NEW ENGLAND, INC.

facts.[34]   Revised Guidance on Procedures for Submitting CERCLA
Section 106(b) Petitions and on EPA Review of Those Petitions, 61 Fed.
Reg. 55298, 55300 (Oct. 9, 1996).   In the NPDES permit setting,
however, an administrative record has been developed in accordance with
the applicable regulations through the various procedures that have
already occurred at the Regional level.   Hence, there is no need, as in the
CERCLA reimbursement context, for the Board to establish procedures
that allow for the development of a factual record via a hearing process.

         Furthermore, as USGen states in its brief, the Board has "created
special procedures to resolve issues *not contemplated* by existing
regulations." USGen Br. in Supp. of Motion at 14.   While this has been
done in the case of CERCLA section 106(b) reimbursement petitions,[35]
this argument has no relevance here.   In this case, as we have stated
above, the regulations do contemplate the issue of whether to hold
evidentiary hearings following NPDES permit issuance – they intend that
such hearings not be held and that factual records instead be built
according to notice and comment procedures.   *See supra* Parts I.A.2,
II.B.2.b, II.B.2.c.

---

[34] When the Board is evaluating a petition for reimbursement, the Board may
request supplemental briefing, direct the parties to present oral argument, or refer
particular factual questions to a hearing officer for the purpose of conducting an
evidentiary hearing. Environmental Appeals Board, U.S. EPA, Practice Manual 46
(2002), *available at* http:// www.epa.gov/eab.manual.htm (hereinafter "EAB Practice
Manual"); *see, e.g., In re Solutia*, 10 E.A.D. 193, 202 (EAB 2001) (noting that oral
argument had been ordered); *In re Oliver*, 6 E.A.D. 85, 93 (EAB 1995) (noting that there
had been supplemental briefing in the case); *In re Tiger Shipyard*, slip op. at 4-5 (noting
that an evidentiary hearing had been held).

[35] There are no federal regulations governing CERCLA reimbursement
proceedings.  The Agency, however, has issued a detailed guidance document which
describes the procedures the Board follows in evaluating section 106(b) petitions.  61
Fed. Reg. at 55298.  Such procedures include those mentioned *supra* note 34.

**f.** *Conclusion*

In sum, we conclude that, for all the reasons articulated above, USGen's request for an evidentiary hearing is essentially a challenge to the Agency's part 124 regulations as amended by the 2000 Final Rule. Because we have concluded that USGen's Motion is a challenge to the Agency's regulations, we next consider whether and, if so, to what extent the CWA section 509(b) judicial review provision is applicable to our review of the Motion.

**C.** *Relevance of Section 509(b) to USGen's Motion*

**1.** *Participants' Arguments*

The Region and Rhode Island both argue that USGen's Motion, because it is a challenge to the 2000 Final Rule, is time-barred by CWA section 509(b), 33 U.S.C. § 1369(b), which requires appeals of the Agency's action "in approving or promulgating any effluent limitation or other limitation" to be made within 120 days of the action. Region Opp'n at 2-3; Region Further Opp'n at 6-9; R.I. Mem. in Supp. of Objection at 13-16. Both point to court decisions holding that the Agency's NPDES program regulations, including those governing the procedures for issuing or denying permits, are "effluent limitation[s] or other limitation[s]" within the meaning of section 509(b)(1)(E).[36] Region Opp'n at 3; Region Further Opp'n at 6-7; R.I. Mem. in Supp. of Objection at 13-14. Thus, they assert, because these NPDES program regulations became effective on May 30, 2000, USGen's Motion was not filed within the 120-day judicial review period. Region Opp'n at 2; Region Further Opp'n at 7; R.I. Mem. in Supp. of Objection at 13. The Region acknowledges that, although judicial review is barred by section 509(b), the Agency may nonetheless consider whether to amend its own

---

[36] The Region also mentions that the Ninth Circuit, in *Natural Resources Defense Council v. EPA*, 966 F.2d 1292, 1296-97 (9th Cir. 1992), concluded that permit regulations are covered by CWA section 509(b)(1)(F) as well as section 509(b)(1)(E).

34                    USGEN NEW ENGLAND, INC.

regulations.  The Region contends, however, that the Board is not the appropriate forum for deciding whether to amend Agency regulations.[37]

USGen's discussion of whether its Motion implicates section 509(b) is quite cursory.  USGen merely argues that, if its Motion does constitute a challenge to the regulations, its request is not barred by section 509(b) because that section only applies to review of the regulations by the Courts of Appeal, not by the Board.[38]  USGen Br. in Supp. of Motion at 15.  USGen also cites a pre-Board case apparently for the proposition that "the unavailability of judicial review due to statutory time limits would generally weigh in favor of agency review of the validity of regulations when they were applied to a specific case."  *Id.* at 15 n.8 (citing *In re Transp., Inc.*, Dkt. No. CAA (211)-27, 1992 WL 43367 (JO, Feb. 25, 1982)).

UWAG, on the other hand, in its brief supporting USGen's Motion, includes a lengthy discussion on this issue.  UWAG Br. in Supp. of Motion at 5-8.  UWAG asserts that USGen's request is not barred by CWA section 509(b) for several reasons.  *Id.* at 5, 7-8.  According to UWAG, section 509(b)(1) only deals with review by the Courts of Appeals, not the Agency, which is why the Board may review regulations under a "compelling circumstances" standard.  *Id.*  UWAG also contends that CWA section 509(b) does not apply to these regulations because they were issued under a section of the CWA – section 402 – not

---

[37] The Region also points out that, during the comment period associated with the 2000 rulemaking "neither the Petitioner nor any other person filed comments suggesting that formal evidentiary hearings are statutorily required in the First Judicial Circuit." Region Opp'n at 3 (citing the 2000 Final Rule, 65 Fed. Reg. at 30,900).  None of the participants have indicated otherwise.  UWAG, however, did comment more generally on that portion of the rule, opposing the removal of the formal hearing process for factual and practical, but not legal, reasons. *See* UWAG Br. in Supp. of Motion at 2-3 & Ex. 1 (noting that UWAG was "reserving comment on EPA's legal conclusions").  Although this may be significant in a challenge to the regulations in the Court of Appeals, we do not find it significant here.

[38] USGen also reiterates that its request does not require a review of the regulations. USGen Br. in Supp. of Motion at 15.  We have already concluded above that it does and need not address this contention further.

included within those provisions enumerated in section 509(b)(1), and courts have held that section 509(b) does not apply to agency actions not specifically listed in section 509(b)(1).  *Id.*  Finally, UWAG claims that, because due process concerns are implicated, preclusive statutes like section 509(b) should be narrowly construed.[39]  *Id.*

### 2. Analysis

Section 509(b) limits applications for judicial review of certain specifically-listed Agency actions to 120 days from the date of the Agency's "determination, approval, promulgation, issuance or denial" of such action. 33 U.S.C. § 509(b). One such enumerated Agency action is the approval or promulgation of "any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345."[40] *Id.* § 509(b)(1)(E). Section 509(b) also provides that review of such Agency action "may be had * * * in the Circuit Court of Appeals of the United States."  *Id.*

In our Order, we asked the participants to address "the applicability, if any, of section 509(b) of the CWA, 33 U.S.C. § 1369(b), * * * on whether Petitioner may challenge this regulation at this time."[41] Order at 4.  In order to answer this larger issue, several threshold questions must first be addressed.  First, do the part 124 regulations at issue in this case fall within the Agency actions to which CWA section 509(b) specifically applies? In other words, are these NPDES regulations "effluent limitation[s] or other limitation[s]" within the meaning of

---

[39] Additionally, UWAG maintains that CWA section 509(b)(2) is inapplicable as it only deals with enforcement proceedings.  UWAG Br. in Supp. of Motion at 7.  We agree with UWAG on this point.

[40] These United States Code sections refer to CWA sections 301, 302, 306, and 405, respectively.

[41] We note that no one challenged the 2000 Final Rule within 120 days of the effective date of the rule.

509(b)(1)(E)?[42]  Second, if CWA section 509(b) does apply to these NPDES regulations, is Board review of the regulations precluded? Finally, if Board review is not precluded, does CWA section 509(b) have any relevance to the Board's review?  We answer these issues below.

**a.** *Applicability of Section 509(b) to These Part 124*
     *Regulations*

Several courts have held that various part 122 through 125 regulations do constitute "effluent limitation[s] or other limitation[s]" within the meaning of section 509(b)(1)(E).  In *Natural Resources Defense Council, Inc. ("NRDC") v. EPA*, 673 F.2d 400 (D.C. Cir. 1982) [hereinafter "*NRDC v. EPA (1982)*"], the D.C. Circuit Court of Appeals faced essentially the same issue raised here with respect to an analogous set of NPDES procedural regulations known at the time as the Consolidated Permit Regulations ("CPRs"), 40 C.F.R. pts. 122-25 (1981).[43]  In that case, petitioners alleged that the NPDES portion of the CPRs did not fall within CWA section 509(b) and thus the circuit court lacked jurisdiction to hear a challenge to them.  *NRDC v. EPA (1982)*, 673 F.2d at 402-03.  The D.C. Circuit Court of Appeals concluded, however, that the regulations, even though they were not technical rules but instead "broad, policy-oriented rules" containing a "complex set of

---

[42] Of the seven enumerated categories of Agency actions listed in 509(b)(1), we consider solely whether the part 124 NPDES regulations fall within the fifth category, i.e., section 509(b)(1)(E).  The only other category to which any of the participants have referred, *see* Region's Opp'n at 3, is the sixth category, section 509(b)(1)(F), which refers to Agency action "in issuing or denying any permit under section 1342 [CWA section 402]."  33 U.S.C. § 1369(b)(1)(F).  The Region, however, does not present any real argument concerning this provision, merely referring to it in a citation.  Because we find that the NPDES regulations at issue here fall within the meaning of 509(b)(1)(E), we will not consider the potential applicability of the sixth category.  The remaining 509(b) provisions appear completely inapposite to the part 124 regulations at issue here and thus are not addressed.

[43] The NPDES portion of the CPRs were promulgated in 1979 and repromulgated, with slight modifications, in 1980.  *NRDC v. EPA (1982)*, 673 F.2d at 401-02 & n.1.  The CPRs were the regulations which the 2000 Final Rule revised.  *See* 1996 Proposed Rule, 61 Fed. Reg. at 65,276.

procedures for issuing or denying NPDES permits," fell within section 509(b)'s "effluent limitation or other limitation" language. *Id.* at 402, 405. The court also pointed out that because EPA cited CWA section 301 as a statutory basis for the regulations, and because the CPRs "set out procedures for obtaining permits that comply with [section] 301," it was fair to conclude that they "were promulgated under [section] 301."[44] *Id.* at 405 n.15.

Likewise, the Ninth Circuit, adopting the rationale of the D.C. Circuit Court of Appeals, held that a challenge to a part 124 procedural regulation[45] was time-barred under section 509(b) because the regulation fell within the section's "effluent or other limitation" language. *Trustees for Alaska v. EPA*, 749 F.2d 549, 550 (9th Cir. 1984); *see also NRDC v. EPA*, 966 F.2d 1292, 1297 (9th Cir. 1992) [hereinafter "*NRDC v. EPA (1992)*"] (holding that it had jurisdiction to review part 122 storm water discharge regulations because, under section 509(b), it "has the power to review rules that regulate the underlying permit procedures").[46]

Several other courts have also read section 509(b)(1)(E)'s "effluent limitation or other limitation" language broadly. For example, the Fourth Circuit held that regulations implementing section 316(b) of

---

[44] Section 301 is one of the CWA's sections pursuant to which an "effluent or other limitation" must be approved or promulgated in order for section 509(b)(1) to apply. *See* 33 U.S.C. §§ 1311, 1369(b)(1)(E); *see also supra* note 40 and accompanying text.

[45] In particular, the participants challenged 40 C.F.R. § 124.85, which required that the permit applicant bear the burden of persuading the agency that a permit should be issued. *Trustees for Alaska* 749 F.2d at 559.

[46] The Board has also remarked in passing that "CWA § 509(b)(1) contemplates that challenges to administrative regulations be brought in a federal circuit court of appeals within 120 days from the date of promulgation of such regulations." *In re City of Irving*, 10 E.A.D. 111, 123 (EAB 2001) (challenge to EPA's part 122 storm water regulations). In that case, however, the participants seemingly did not raise the issue, raised here, of whether the specific regulations at issue fell within those categories of actions reviewable under section 509(b)(1). *See id.* Additionally, one federal circuit court had already determined that review of storm water regulations did fall within CWA section 509(b)(1). *NRDC v. EPA (1992)*, 966 F.2d at 1296-97.

the Act and concerning structures used to withdraw water for cooling purposes are "other limitation[s]" under section 509(b)(1)(E). *Va. Elec. & Power Co. ("VEPCO") v. Costle*, 566 F.2d 446, 447-51 (4th Cir. 1977); *accord Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 183-84 (2d Cir. 2004) (finding that the part 125 rule governing cooling water intake structures is an "other limitation" within the meaning of CWA section 509(b)(1)); *see also NRDC v. EPA*, 656 F.2d 768, 776 (D.C. Cir. 1981) [hereinafter "*NRDC v. EPA (1981)*"] (finding challenged part 125 regulations to be within the section 509(b)(1)(E) "effluent or other limitation" language despite the fact that they do not contain numerical limitations because, in part, they prescribe requirements for permit applicants). *But see Envtl. Prot. Info. Ctr. ("EPIC") v. Pac. Lumber Co.*, 266 F. Supp. 2d 1101, 1117 (N.D. Cal. 2003) (holding that "the nonpoint source provision of the silviculture regulation [at 40 C.F.R. § 122.27] is not an 'effluent limitation or other limitation' under section 301" and therefore CWA section 509(b)(1)(E) did not prohibit the challenge in district court).

UWAG argues that because the part 124 rules are "purely procedural" in nature and were allegedly issued under section 402 of the CWA – a section not included within the seven categories enumerated in section 509(b)(1) – section 509(b) does not apply to them. UWAG Br. in Supp. of Motion at 7. The cases cited by UWAG in support of its position, however, are not entirely on point.

The courts in both *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307 (9th Cir. 1992), and *Friends of the Earth ("FOE") v. EPA*, 333 F.3d 184 (D.C. Cir. 2003), considered whether the Agency's issuance of certain total maximum daily load limits ("TMDLs") fell within the section 509(b) judicial review provision. Both courts explained that the TMDLs were issued by the Agency *under CWA section 303*, 33 U.S.C. § 1313, "a statutory provision not among those listed in section 509(b)(1)(E)." *FOE*, 333 F.3d at 188; *accord Longview*, 980 F.3d at 1310. Because both courts concluded that Congress intended any sections not expressly listed in section 509(b) to be excluded, the failure of section 509(b)(1)(E) to expressly list section 303 was viewed as fatal. *FOE*, 333 F.3d at 188; *Longview*, 980 F.2d at 1312-13; *see also Bethlehem Steel Corp. v. EPA*, 538 F.2d 513, 514 (2d Cir. 1976) (holding

that the specificity of the CWA section 509(b) review provision implies that actions not listed within the provision are not to be reviewed directly by the courts of appeal).

The Fifth Circuit, in the other case cited by UWAG, considered whether an order issued by EPA *under CWA section 309(a)(3)*, 33 U.S.C. § 1319(a)(3), which required compliance with an NPDES permit, was reviewable under section 509(b)(1). *City of Baton Rouge v. EPA*, 620 F.2d 478 (5th Cir. 1980). The court concluded that "the specificity of the review provisions of [section 509(b)] and the absence of any mention of compliance orders from those provisions" precluded the appeal court's review of the order. 620 F.2d at 480.

Although instructive regarding the general interpretation of CWA section 509(b)(1), none of the three cases UWAG cites diminish the precedential value of the cases discussed above which more particularly interpret section 509(b)(1)(E) and its application to rules establishing NPDES permit procedures. In *NRDC v. EPA (1982)* and *Trustees of Alaska*, the D.C. and Ninth Circuit Courts of Appeal found that the promulgation of various regulations setting forth procedures for obtaining NPDES permits, which are Agency actions identical to the one at issue here, *did* fall within the CWA section 509(b)(1)(E) language and thus *were* covered by section 509(b)(1). *NRDC v. EPA (1982)*, 673 F.2d at 402-07; *Trustees of Alaska*, 740 F.2d at 559. The fact that the *Longview*, *FOE*, and *Baton Rouge* courts found that Agency actions establishing TMDLs under section 303 or issuing compliance orders under section 309(a)(3), which are not actions similar to the one here, did not fall within any of the categories of activities listed in CWA sections 509(b)(1)(A)-(G), and thus were not covered by section 509(b)(1), does not affect the conclusions in either *NRDC v. EPA (1982)* or *Trustees of Alaska*.

UWAG's argument that CWA section 509(b) is not relevant to this case because the 2000 Final Rule was issued solely under section 402 must also fail. *See* UWAG Br. in Supp. of Motion at 7. As the Agency stated in the Authority section of the final rule, the NPDES portion of the rule is based on the CWA in its entirety. 2000 Final Rule, 65 Fed. Reg. at 30,910. It therefore includes section 301. As the D.C. Circuit court

40                    USGEN NEW ENGLAND, INC.

has stated, "EPA cited [section] 301 as a statutory basis for the CPRs, and the CPRs set out procedures for obtaining permits that comply with [section] 301. It is thus fair to say that the CPRs were promulgated under [section] 301." *NRDC v. EPA (1982)*, 673 F.2d at 405 n.15. Likewise, it is fair to say that the 2000 amendments to part 124, which cited the CWA as a whole for their authority, and which set forth procedures for obtaining NPDES permits complying with section 301, were promulgated, at least in part, under section 301.[47]

It is also worth noting that the D.C. and Fourth Circuit Courts of Appeal, in holding that CWA section 509(b)(1)(E)'s "effluent limitation or other limitation" language covered various NPDES regulations, stated that court of appeals review of general NPDES regulations of nationwide applicability makes practical sense as it "is consistent with the jurisdictional scheme of the Act, * * * furthering the aim of Congress to achieve nationally uniform standards." *VEPCO*, 566 F.2d at 451; *accord NRDC v. EPA (1982)*, 673 F.2d at 405 n.15 ("National uniformity, an important goal in dealing with broad regulations, is best served by initial review in a court of appeals.");[48] *cf. Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 196-97 (1980) (broadly interpreting CWA section 509(b)(1)(F) to allow for review in the courts of appeal based, at least in part, on the "irrational" practical implications of the alternate

---

[47] In fact, in *FOE*, which UWAG cites, the court specifically distinguished its holding from the *NRDC v. EPA (1982)* decision based on the fact that the CPRs in the earlier case were promulgated under section 301 (which is a provision expressly listed in section 509(b)(1)(E)) whereas the TMDLs were not. *FOE*, 333 F.3d at 191 n.15. In addition, even the *EPIC v. Pacific Lumber Co.* decision, which is the only case suggesting that not all procedural regulations within parts 122 through 125 necessarily fall within the meaning of section 509(b)(1)(E), indicates that a difference may exist between those regulations codified as part of the CPRs that "set out procedures for obtaining permits that comply with [section] 301" and those that do not. 266 F. Supp. 2d at 1118 (quoting *NRDC v. EPA (1982)*, 673 F.2d at 405 n.15). The regulations at issue in this permit proceeding are procedures for obtaining permits that comply with section 301.

[48] The D.C. Circuit, in *NRDC v. EPA (1982)*, also stated that "[i]f anything, the case for first-instance judicial review in a court of appeals is stronger for broad, policy-oriented rules than for specific, technology-based rules." 673 F.2d at 405.

interpretation). Such considerations seem equally applicable here, especially in light of the particular procedural challenge raised by USGen's Motion.[49]

Based upon the foregoing, we conclude that CWA section 509(b) does apply to the 2000 Final Rule, as those regulations are "effluent limitation[s] or other limitation[s]" within the meaning of CWA section 509(b)(1)(E).[50] We next consider whether our review of the part 124 regulations is precluded by the fact that the section 509(b) judicial review provision applies to them.

### b. *Scope of Board Review of Regulations Subject to Judicial Review Provisions*

As we stated in our Order, the Board generally does not entertain challenges to final Agency regulations in the context of permit appeals. Order at 3; *accord In re City of Irving*, 10 E.A.D. 111, 123-25 (EAB 2001), *petition for review denied*, 325 F.3d 657 (5th Cir. 2003); *In re Tondu Energy Co.*, 9 E.A.D. 710, 715-16 (EAB 2001); *In re City of Port St. Joe*, 7 E.A.D. 275, 286 (EAB 1997); *see also In re Suckla Farms, Inc.*, 4 E.A.D. 686, 699 (EAB 1993); *In re Ford Motor Co.*, 3 E.A.D. 677, 682 n.2 (Adm'r 1991). Significantly, the regulations governing the Board's review of permits authorizes the Board to review *conditions* of the permit decision, not statutes or regulations which are the predicates for such conditions. *See* 40 C.F.R. § 124.19(a); *see also City of Irving*, 10 E.A.D. at 124; *Ford Motor*, 3 E.A.D. at 682 n.2. Moreover, the

---

[49] The D.C. Circuit also noted that allowing district court review of regulations containing general NPDES requirements "would produce the truly perverse situation in which the court of appeals would review numerous individual actions issuing or denying permits * * * but would have no power of direct review of the basic regulations governing those individual actions." *NRDC v. EPA (1982)*, 673 F.2d at 405-06 (quoting *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977)); *accord NRDC v. EPA (1981)*, 656 F.2d at 186-87; *see also Crown Simpson*, 445 U.S. 196-97. This, too, is equally relevant here.

[50] Even in the absence of a preclusive review provision, we review Agency rules under very narrow circumstances and this case would not likely meet the threshold for such review. *See infra* note 55.

42                          USGEN NEW ENGLAND, INC.

"presumption of nonreviewability in the administrative context is especially appropriate when Congress * * * has set precise limits on the availability of a judicial forum for challenging particular kinds of regulations."[51] *In re Woodkiln, Inc.*, 7 E.A.D. 254, 269 (EAB 1997) (relying on *In re Echevarria*, 5 E.A.D. 626, 634-35 (EAB 1994)); *see also City of Irving*, 10 E.A.D. at 123 (explaining that, in general, a permit appeal cannot be used "as a vehicle for collateral challenge of regulatory provisions when the time for such challenge has long since passed"); *In re City of Moscow*, 10 E.A.D. 135, 160-61 (EAB 2001) (holding that the Board will not review "the validity of prior, predicate regulatory decisions that are reviewable in other fora"). In *Echevarria*, the Board provided a detailed analysis of its authority to review a regulation where the underlying statute contained a provision precluding judicial review issue:

> While it is true * * * that the [Act] makes direct reference to preclusion of judicial review, not

---

[51] USGen cites to *In re Transportation, Inc.*, CAA Dkt. No. (211)-27, 1982 WL 43367 (JO, Feb. 25, 1982), as presumably standing for the proposition that "the unavailability of judicial review due to statutory time limits would generally weigh in favor of agency review of the validity of regulations when they were applied to a specific case." USGen Br. in Supp. of Motion at 15 & n.22. USGen, however, has misstated the Judicial Officer's observations in that case. The Judicial Officer, who was one of the Agency's predecessors to the Board, noted in dicta that challenges to regulations in an administrative hearing "should rarely be entertained as a matter of right." 1982 WL 43357 (E.P.A.) at n.8. He then listed a number of considerations that should be weighed in this regard, including the need for finality of the regulation and whether judicial review was still available or was precluded by statute. *Id.* The listing did not indicate whether preclusion of judicial review would militate in favor of or against administrative review. *See id.* He determined, based on *many* of the considerations that he listed, that it was appropriate in that case to review the challenged regulation. *Id.* Although he may have considered the fact that the judicial review period had passed, the decision is not clear on this point. *See id.* He also expressed the opinion that it was doubtful that the regulations at issue could have been judicially challenged by respondents at the time of their promulgation. *Id.* We do not find this decision inconsistent with the presumption of nonreviewability discussed above. In fact, the Judicial Officer's statement quoted above suggests such a presumption. Furthermore, because it is not clear what significance, if any, he gave to the possibility that the statutory judicial review period had passed, we do not find persuasive USGen's reliance on the case for the proposition that we should be less inclined to apply the presumption to this matter.

**USGEN NEW ENGLAND, INC.**                    43

administrative review, the effect of this statutory
provision is to make it unnecessary for an administrative
agency to entertain as a matter of right a party's
challenge to a rule subject to this statutory provision.
Thus, ordinarily, the only way for a regulation that is
subject to a preclusive review provision to be
invalidated is by a court in accordance with the terms of
the preclusive review provision. * * * Manifestly,
neither [Petitioner] nor anyone else has succeeded in
having a court invalidate the [rule] at issue in this case.
Therefore, the rule is no longer subject to judicial
challenge, and the Agency, for reasons of administrative
efficiency, is obviously not interested in reexamining
such a rule in an administrative proceeding. Once the
rule is no longer subject to court challenge by reason of
the statutory preclusive review provision, the Agency is
entitled to close the book on the rule insofar as its
validity is concerned. The Agency retains the power,
however, to repeal or amend the rule if the rule no
longer serves its intended purposes. Similarly, citizens
may petition the Agency to repeal or amend a rule if it
is not to their liking. In both instances, however, the
means of repealing or amending the rule are carried out
in the context of rulemaking * * *.

5 E.A.D. at 634-35 (citations and footnotes omitted); *see also City of
Irving*, 10 E.A.D. at 123-24; *Woodkiln*, 7 E.A.D. at 269-70.[52]

---

[52] As the Board noted in *Woodkiln*, the reviewability issue arose in *Echevarria*
in the context of an enforcement action, not a permit appeal. 7 E.A.D. at 270 n.16. The
Board explained, however, that the rationale in *Echevarria* "for turning aside untimely
challenges to the validity of final Clean Air Act regulations are fully applicable" where
the challenge arises in a situation akin to a permit appeal. *Id.* Because the Board's
analysis of the reviewability issue in *Echevarria* was particularly detailed, the Board
often cites this case in the context of both penalty and permit appeals. *E.g.*, *City of
Irving*, 10 E.A.D. at 124 (permit appeal); *B.J. Carney*, 7 E.A.D. at 194 (penalty appeal).

44                          USGEN NEW ENGLAND, INC.

Based upon these considerations, the Board has concluded that
there is "an especially strong presumption" against entertaining a
challenge to the validity of a regulation subject to a preclusive judicial
review provision.   *Echevarria*, 5 E.A.D. at 635.   Because this
presumption is a rule of practicality, there may be "an exceptional case"
where an "extremely compelling argument" is made, such as where a
regulatory decision has been effectively invalidated by a court but has yet
to be formally repealed by the Agency.[53]  *Id.* at 635 & n.13; *City of
Irving*, 10 E.A.D. at 123-24 & n.17; *City of Moscow*, 10 E.A.D. at 161;
*Woodkiln*, 7 E.A.D. at 269-70 & n.16; *see also In re B.J. Carney Indus.*,
7 E.A.D. 171, 194 (EAB 1997) (stating that review of a regulation may
be appropriate only in the "most compelling circumstances"), *appeal
dismissed as moot,* 200 F.3d 1222 (9th Cir. 2000).

In this case, the CWA section 509(b) provision clearly indicates
Congress' intention to prohibit challenges to these regulations after 120
days.   Accordingly, based on the principles articulated in the Board cases
discussed above, while Board review of the amended part 124 regulations
is not absolutely precluded by CWA section 509(b),[54] we will only

---

[53] A pre-Board case, *In re 170 Alaska Placer Mines, More or Less*, 1 E.A.D.
616 (Adm'r 1980), which USGen cited in its brief for the proposition that the Board
could review the rule, *see* USGen Br. in Supp. of Motion at 15 n.21, is illustrative of this
narrow exception.  In that case, the Administrator reviewed an NPDES procedural rule
and found it, in certain cases, to be wholly contrary to the CWA's allocation of the
burden of persuasion (in particular, in those cases in which the requester of the hearing
was not the permit applicant).  1 E.A.D. at 626-27.  The Administrator consequently
remanded the proceedings so that additional evidence could be introduced and the proper
burden of persuasion employed.  *Id.* at 623.  In the remand order, the Administrator also
noted that, subsequent to the appeal, the challenged regulation had been revised to reflect
the correct allocation of the burden of persuasion.  *Id.* at 627.  Thus, the Agency had
already acknowledged its initial error.  Obviously, this has no parallel to the current
appeal.

[54] Because we find that Board review is not absolutely precluded by CWA
section 509(b), we do not address UWAG's contention that 509(b) should be construed
narrowly where due process concerns are present.  UWAG Br. in Supp. of Motion at 8.
We observe, however, that this same argument was rejected in *NRDC v. EPA (1982)*, 673
F.2d 400, 406-07.

review USGen's challenge to the regulations if there are "extremely compelling" circumstances warranting such review.[55]

**D.** *Does USGen's Motion Present Extremely Compelling Circumstances Warranting Review?*

      In our Order Granting Review, based upon the principles described above in Part II.C, we asked those participants submitting briefs supporting or opposing USGen's Motion to address whether or not the circumstances of this case meet the Board's standard of reviewability articulated in *Echevarria* and *B.J. Carney*. Order at 4.

    *1. Participants' Arguments*

      The Region and Rhode Island both argue that there are no unusual or compelling circumstances in this case. R.I. Mem. in Supp. of Objection at 11-13; Region Further Opp'n at 15-18. Rhode Island maintains that USGen has merely raised a variety of disagreements it has with the permitting decision. R.I. Mem. in Supp. of Objection at 13. The Region contends that there are, in fact, several compelling reasons *not* to review the regulations. Region Further Opp'n at 15. One such reason, according to the Region, is because "the regulations at issue were adopted only after recent and full consideration of the very Constitutional

---

[55] Because the Board, as a general rule, does not entertain challenges to a rulemaking in a permit review proceeding, even if CWA section 509(b) did not apply to the regulations at issue here, a presumption against review of the regulations would still apply. *See* discussion *supra* Part II.C.2.b; *see also In re City of Port St. Joe*, 7 E.A.D. 275, 286-87 (EAB 1997) ("A permit appeal proceeding is not the appropriate forum in which to challenge either the validity of Agency regulations or the policy judgments that underlie them."); *In re Suckla Farms, Inc.*, 4 E.A.D. 686, 699 (EAB 1993); *In re Ford Motor Co.*, 3 E.A.D. 677, 682 n.2 (Adm'r 1991). In those circumstances, a similar standard of review to the one we have already articulated would apply, i.e., review would only be taken in compelling circumstances. *See B.J. Carney*, 7 E.A.D. at 194 (holding that the Board will entertain a challenge to an Agency regulation only in "the most compelling circumstances"). Such circumstances are not present here.

and statutory issues that the Petitioner is attempting to revisit."[56]  *Id.*
at 16.

In its supplemental brief, USGen barely addresses this issue,
merely commenting that its Motion "does not implicate EAB decisions
expressing reluctance to undertake review of a regulation in a permitting
appeal" and noting an EPA case in which the Administrator did, in fact,
consider a challenge to a regulation.[57]  USGen Br. in Supp. of Motion
at 15 & n.21 (citing *In re Matter of 170 Alaska Placer Mines, More or
Less,* 1 E.A.D. 616 (Adm'r 1980)); *see also supra* note 53. UWAG, on
the other hand, does respond to our question, arguing that the First
Circuit decision in *Dantran, Inc. v. Dep't of Labor,* 246 F.3d 36 (1st Cir.
2001), is a "compelling circumstance" warranting review of the rule
because it "undermines a fundamental legal assumption on which the rule
was based." UWAG Br. in Supp. of Motion at 6 (relying on *Echevarria,*
5 E.A.D. at 635 n.13). UWAG contends that the *Dantran* decision has
"negated" the assumption underlying the 2000 Final Rule – that "due to
the progress of the law in the Courts of Appeals, [*Seacoast*] is no longer
good law." *Id.* (citing 2000 Final Rule, 65 Fed. Reg. at 30896).

### 2. Analysis

We find nothing in USGen's or UWAG's brief, or in the facts
surrounding this case, that provides a compelling argument to overcome
the strong presumption against entertaining challenges to the validity of
a regulation in a permit appeal.  USGen has failed to provide any
argument on this issue, and, as we explain below, we are not persuaded
by UWAG's argument. Moreover, as we observed earlier, the fact that
CWA section 509(b) of the CWA would preclude review of this issue in

---

[56] The Region also cites several timeliness concerns.  Region Further Opp'n
at 16-17.  We have addressed those concerns elsewhere in this order.  *See supra* Parts
II.A.2, II.C.2.a; *see also infra* Part II.E.

[57] We presume that USGen did not address this issue in any significant detail
because of its stalwart reliance on the position that its Motion is not a challenge to the
regulations.

federal district and circuit courts based on timeliness grounds militates particularly strongly against our reviewing the issue here.

UWAG's argument that the *Dantran* decision, issued after the 2000 Final Rule, is a "compelling" reason to review the regulation is unconvincing. While the Board has stated that a compelling reason to review a regulation may include circumstances "where [a rule] has been held invalid by an intervening court decision," *Echevarria*, 5 E.A.D. at 635 n.13, this is not the situation here. The *Dantran* court in no way held *the Agency's Final 2000 Rule* invalid. Indeed, the *Dantran* case involved a challenge to a rule promulgated by the Secretary of Labor pursuant to the McNamara-O'Hara Service Contract Act of 1965 ("SCA"), 41 U.S.C. §§ 351-358. 246 F.3d at 38. The mere fact that the First Circuit, in interpreting the SCA, cited *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872 (1st Cir. 1978), *see* 246 F.3d at 46, does not persuade us that the 2000 amendments to EPA's part 124 regulations have been invalidated by the court. Accordingly, we do not find the First Circuit's relatively recent *Dantran* decision to constitute a "compelling" circumstance overcoming the strong presumption of nonreviewability pertaining to the 2000 Final Rule.

In sum, we have found USGen's request for an evidentiary hearing to constitute a challenge to the validity of the 2000 Final Rule. Neither USGen nor UWAG has presented any compelling arguments persuading us that we should entertain USGen's regulatory challenge in the context of this permit appeal. We therefore decline to do so.

**E.** *USGen's Constitutional/Due Process Argument*

In it supplemental brief, USGen appears to suggest that constitutional due process principles require the Agency to provide an evidentiary hearing. *See* USGen Br. in Supp. of Motion at 15-20. USGen enumerates several procedural requirements it believes necessary to satisfy its due process rights. *Id.* The Region asserts that USGen's due process argument is untimely for several reasons: (1) USGen did not raise it in its original petition; (2) it was not raised in the comment period on the permit; and (3) it involves a challenge to the regulations and thus should have been brought in federal circuit court under CWA section

48          USGEN NEW ENGLAND, INC.

509(b). Region Further Opp'n at 19. The Region also argues that USGen's due process argument lacks merit. *Id.*

In our Order Granting Review, we asked participants to discuss the applicability of "other legal authority" that could bear on the question of whether Petitioner may challenge the part 124 regulations at the current time. Order at 4. Because we invited additional arguments in our Order, even though the constitutional issue was first raised in USGen's supplemental brief, we will not dismiss USGen's due process argument as untimely either because USGen failed to raise it in its Petition or because USGen failed to raise it in the comment period on the permit.

However, we find that USGen's due process argument is essentially a repackaging of the same issues we have already discussed above in Parts II.B and II.C. By intimating that the Agency must provide an evidentiary hearing under principles of due process despite the fact that the Agency amended the relevant regulations in its 2000 Final Rule to remove such a  process, USGen is basically challenging the constitutionality of the 2000 Final Rule. *See* discussion *supra* Parts II.B. Applying the principles discussed above, *see supra* Parts II.B.2, II.C.2.a, to this constitutional challenge, although CWA section 509(b) does not preclude our review, USGen must overcome an especially strong presumption against our entertaining a challenge to the validity of the regulations. *E.g., In re City of Irving*, 10 E.A.D. 111, 124 (EAB 2001) (stating that the Board has "repeatedly refused to entertain challenges to the constitutionality of statutes and Agency regulations"); *In re B.J. Carney Indus.*, 7 E.A.D. 171, 194 (EAB 1997) (noting that "constitutional challenges to regulations, even challenges based upon due process claims, are rarely entertained in Agency * * * proceedings, and there is a strong presumption against entertaining challenges to the validity of a regulation in an administrative * * * proceeding"), *appeal dismissed as moot,* 200 F.3d 1222 (9th Cir. 2000); *see also In re City of Port St. Joe,* 7 E.A.D. 275, 317 n.58 (EAB 1997). As we have previously discussed, neither USGen or UWAG have presented any compelling arguments or described exceptional circumstances persuading us that we should entertain this constitutional challenge to the regulations in the context of the current permit appeal. Thus, we decline to do so.

USGEN NEW ENGLAND, INC.                              49

We do note, however, that the Agency's procedures provide a great deal of process to permit applicants. As generally described above, *see* Part I.A.2, a person seeking a permit submits an application which may contain any information which the person believes to be relevant to the permit conditions. 40 C.F.R. § 124.3(a). This, of course, may include a substantial amount of technical and expert information. After the Region issues a draft permit, the permit applicant may submit additional information to the Agency, which may include any expert information of its own or rebuttal information regarding others' submissions.[58] *Id.* § 124.11; *see also id.* § 124.13 (requiring all persons, including applicants to raise all issues and provide all reasonably available supporting information prior to the close of the comment period). Where a permit is of significant interest, a public hearing, presided over by a hearing officer, is required wherein a permit applicant may present additional oral testimony and information to the Agency.[59] *Id.* § 124.12(a)(1), (b)-(c). If new material or new points are raised during the public comment period, the Agency may document its response to that information by adding new materials to the administrative record. 40 C.F.R. § 124.17(b). Based on all the information the Region has received from the permit applicant and other interested persons, through written and oral statements, which may include expert statements and technical information, as well as statements rebutting technical matters, the Region issues its final permit decision. *Id.* § 124.18 (requiring the Region to base final permit decisions on the administrative record); *see also id.* § 124.15 (requiring the Region to issue a response to comments document at the time a final permit is issued).

Following the Region's decision on the permit, a permittee may challenge any condition of the permit by filing a timely appeal with the Board. *Id.* § 124.19(a). Such appeal is analogous to a record review, in

---

[58] In this case, USGen did, in fact, submit numerous documents to the Region at various times during the permitting process. *See* Petition at 4-5.

[59] Two public hearings were held in this matter. *See* Response at 8. The Region and MA DEP also apparently held two public informational meetings prior to the two public hearings. *See id.* at 8-9.

50                    USGEN NEW ENGLAND, INC.

that the Board considers the issues raised in light of any relevant information in the record below.[60] *See, e.g., In re D.C. Mun. Separate Storm Sewer Sys.*, 10 E.A.D. 323, 342-43 (EAB 2002) (remanding, in part, because of the lack of support in the administrative record); *In re Steel Dynamics, Inc.*, 9 E.A.D. 165, 180 & nn.15-16 (EAB 2000) (remanding, in part, because of the permitting authority's failure to document the basis for its administrative decisionmaking process in the record); *see also In re Westborough*, 10 E.A.D. 297, 303-04 (EAB 2002) (describing the Board's scope of review in detail). Applicants may raise both legal and factual issues. 40 C.F.R. § 124.19(a)(1). Thus, review at the Board is a vehicle for challenges to fact-based issues as well as legal issues. If the Board finds that the Region has made a factual error, the Board typically remands the case to the Region. *E.g., Westborough*, 10 E.A.D. at 318-20; *Steel Dynamics*, 9 E.A.D. at 180-81; *Port St. Joe*, 7 E.A.D. at 304; *In re Marine Shale Processors, Inc.*, 5 E.A.D. 461, 471-73 (EAB 1994); *In re Broward County, Fla.*, 4 E.A.D. 705, 712-14, 718-19 (EAB 1993). It is also important to note that any challenged permit conditions are stayed until the Board's review of those conditions is completed. 40 C.F.R. § 124.16.

Moreover, we believe the current Agency process adequately incorporates each of the three "critical elements" USGen enumerates in its brief: (1) the availability of an impartial hearing officer, (2) the compilation of the complete record for the basis of the decision, and (3) the opportunity to cross-examine a small number of key witnesses. USGen Br. in Supp. of Motion at 15. With respect to the first critical element listed by USGen, USGen has indicated that it considers the judges at the Board to be impartial and unbiased. *Id.* at 16. Although our review will occur in the context of a record review proceeding rather than an evidentiary hearing, the issues raised by USGen will certainly be considered, including any questions raised concerning the factual predicate for the Region's permit decision. Thus, USGen's issues will be thoroughly considered by impartial reviewers. With respect to the

---

[60] Upon receiving a petition for review of an NPDES permit, the Board requests the permitting authority to file a response to the petition and to include a certified index of all documents in the administrative record as well as copies of those parts of the record that pertain to the matters raised in the petition. *See* EAB Practice Manual at 35-36.

second "critical element," as discussed above, an administrative record was compiled at the Regional level, which formed the basis of the final permit decision.[61] Finally, with respect to critical element three – the opportunity to cross-examine certain key witnesses – USGen has admitted that such an opportunity is not always required by courts as a means of ensuring due process. USGen Br. in Supp. of Motion at 17 (citing *Seacoast Anti-Pollution League v. Costle*, 572 F.2d 872, 880 (1st Cir. 1978)). Additionally, as we mentioned above, in NPDES permit issuance proceedings, applicants may submit written rebuttal testimony to contradict the data, assumptions, and/or analysis of an opposing expert on any issue, including technical ones. As the Agency stated in the preamble to the 2000 Final Rule, most NPDES permit issues "hinge on technical considerations for which cross-examination is not particularly useful." 2000 Final Rule, 65 Fed. Reg. at 30,899. Thus, USGen has had available to it, and has indeed exercised, substantial opportunities to challenge the findings of opposing experts during these NPDES permit proceedings.[62]

**F.** *Other Considerations*

Several of the participants submitting briefs on the evidentiary hearing issue raised other practical considerations that they assert should weigh heavily against granting USGen's Motion. *See* R.I. Mem. in Supp.

---

[61] If any information that should have been included in the record was not, USGen may petition the Board regarding those documents, which it has already done in this case. *See* USGen Motion to Supplement the Administrative Record. Additionally, as noted above, if the Board determines that certain relevant information should have been considered, the Board would likely remand the permit decision back to the Region. *E.g.*, *Steel Dynamics*, 9 E.A.D. at 179-80 (remanding because data was not included in the public record); *In re Knauf Fiber Glass, GMBH*, 8 E.A.D. 121, 141-44 & nn.32, 34, 174-75 (EAB 1999) (remanding, in part, to correct serious deficiencies in the administrative record and because of the failure to include certain details in the administrative record); *In re Haw. Elec. Light Co.*, 8 E.A.D. 66, 99-103 (EAB 1998) (declining to rely upon new data on appeal and remanding to allow permitting authority to prepare updated report, followed by notice and comment).

[62] As we have already stated, *see supra* note 12, the lack of formal adjudicatory procedures does not, in and of itself, constitute a due process violation by the Agency.

52                    **USGEN NEW ENGLAND, INC.**

of Objection at 16-19; CLF Mem. in Supp. of Objection at 3-5; CLF
Further Opp'n to Motion at 1-2. For example, according to Rhode
Island, there is no practical value to an evidentiary hearing in this case
because the only benefit of a hearing would be the benefit to USGen of
a delay in the implementation of the permit. R.I. Mem. in Supp. of
Objection at 16; *see also* CLF Mem. in Supp. of Objection at 3-5.
However, because we have already concluded that USGen is not entitled
to an evidentiary hearing, we need not analyze the practical
considerations raised by these participants.[63]

### III. *CONCLUSION*

For the foregoing reasons, we conclude that USGen's Motion is,
in effect, a challenge to the 2000 Final Rule, which amended the NPDES
procedural regulations at 40 C.F.R. part 124. Nothing in USGen or
UWAG's briefs, or in the facts of the case, demonstrates that any
compelling circumstances exist here which would overcome the
presumption against entertaining a statutory or constitutional challenge
to the validity of the regulations in the context of a permit appeal.
Consequently, the Board DENIES Petitioner's Motion for an evidentiary
hearing. The Board will therefore proceed to the consideration of the
other motions and arguments made in this matter.

So ordered.[64]

---

[63] Many of the participants briefing the evidentiary hearing issue included
arguments predicting how the First Circuit would currently interpret the CWA section
402 (and section 316(a)) phrase "opportunity for public hearing" in light of both the
Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
467 U.S. 837 (1984), and the more recent First Circuit and other federal circuit court
decisions. Because we find that USGen's Motion is a challenge to the regulations, and
because we conclude that this case does not present any compelling reasons for us to
review USGen's regulatory challenge, we do not believe it necessary to speculate on how
the First Circuit would interpret sections 316(a) and 402 today.

[64] Although this order does not resolve all issues in this permit appeal, the
Board nevertheless intends to publish it in the Environmental Administrative Decisions.
The order is therefore formatted in the same manner as a published Board decision.